## CITY OF CHICAGO ET AL. *v.* ENVIRONMENTAL DEFENSE FUND ET AL.

No. 92–1639.  Argued January 19, 1994—Decided May 2, 1994

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined. STEVENS, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 340.

*Lawrence Rosenthal* argued the cause for petitioners. With him on the briefs were *Susan S. Sher, Benna Ruth Solomon,* and *Mardell Nereim.*

*Jeffrey P. Minear* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Days, Acting Assistant Attorney General Flint, Deputy Solicitor General Wallace, David C. Shilton, M. Alice Thurston, Gerald H. Yamada,* and *Lisa K. Friedman.*

*Richard J. Lazarus* argued the cause and filed a brief for respondents.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of New York by *Robert Abrams,* Attorney General, *Jerry Boone,* Solicitor General, *Peter H. Schiff,* Deputy Solicitor General, and *James A. Sevinsky* and *Kathleen Liston Morrison,* Assistant Attorneys General; for Barron County, Wisconsin, et al. by *Philip G. Sunderland, Max Rothal, Pamela K. Akin, Stephen O. Nunn, Cynthea L. Perry, Howard J. Wein, Charles H. Younger, John D. Pirich, David P. Bobzien, Felshaw King, Mary Anne Wood, Michael F. X. Gillin, Ruth C. Balkin, Patrick T. Boulden,* and *Barry S. Shanoff;* for the City of Spokane, Washington, et al. by *Craig S. Trueblood;* for the County of Westchester, New York, by *Carol L. Van Scoyoc;* for the National League of Cities et al. by *Richard Ruda, David R. Berz,* and *David B. Hird;* for the Washington Legal Foundation et

JUSTICE SCALIA delivered the opinion of the Court.

We are called upon to decide whether, pursuant to § 3001(i) of the Solid Waste Disposal Act (Resource Conservation and Recovery Act of 1976 (RCRA)), as added, 98 Stat. 3252, 42 U. S. C. § 6921(i), the ash generated by a resource recovery facility's incineration of municipal solid waste is exempt from regulation as a hazardous waste under Subtitle C of RCRA.

I

Since 1971, petitioner city of Chicago has owned and operated a municipal incinerator, the Northwest Waste-to-Energy Facility, that burns solid waste and recovers energy, leaving a residue of municipal waste combustion (MWC) ash. The facility burns approximately 350,000 tons of solid waste each year and produces energy that is both used within the facility and sold to other entities. The city has disposed of the combustion residue—110,000 to 140,000 tons of MWC ash per year—at landfills that are not licensed to accept hazardous wastes.

In 1988, respondent Environmental Defense Fund (EDF) filed a complaint against petitioners, the city of Chicago and its mayor, under the citizen suit provisions of RCRA, 42 U. S. C. § 6972, alleging that they were violating provisions of RCRA and of implementing regulations issued by the Environmental Protection Agency (EPA). Respondent alleged that the MWC ash generated by the facility was toxic enough to qualify as a "hazardous waste" under EPA's regulations, 40 CFR pt. 261 (1993). It was uncontested that, with respect to the ash, petitioners had not adhered to any of the requirements of Subtitle C, the portion of RCRA addressing hazardous wastes. Petitioners contended that

al. by *Daniel J. Popeo, Paul D. Kamenar,* and *Kurt J. Olson;* and for Wheelabrator Technologies Inc., et al. by *Harold Himmelman, David M. Friedland,* and *Mark P. Paul.*

RCRA § 3001(i), 42 U. S. C. § 6921(i), excluded the MWC ash from those requirements. The District Court agreed with that contention, see *Environmental Defense Fund, Inc.* v. *Chicago*, 727 F. Supp. 419, 424 (1989), and subsequently granted petitioners' motion for summary judgment.

The Court of Appeals reversed, concluding that the "ash generated from the incinerators of municipal resource recovery facilities is subject to regulation as a hazardous waste under Subtitle C of RCRA." *Environmental Defense Fund, Inc.* v. *Chicago*, 948 F. 2d 345, 352 (CA7 1991). The city petitioned for a writ of certiorari, and we invited the Solicitor General to present the views of the United States. *Chicago* v. *Environmental Defense Fund, Inc.*, 504 U. S. 906 (1992). On September 18, 1992, while that invitation was outstanding, the Administrator of EPA issued a memorandum to EPA Regional Administrators, directing them, in accordance with the agency's view of § 3001(i), to treat MWC ash as exempt from hazardous waste regulation under Subtitle C of RCRA. Thereafter, we granted the city's petition, vacated the decision, and remanded the case to the Court of Appeals for the Seventh Circuit for further consideration in light of the memorandum. *Chicago* v. *Environmental Defense Fund*, 506 U. S. 982 (1992).

On remand, the Court of Appeals reinstated its previous opinion, holding that, because the statute's plain language is dispositive, the EPA memorandum did not affect its analysis. 985 F. 2d 303, 304 (CA7 1993). Petitioners filed a petition for writ of certiorari, which we granted. 509 U. S. 903 (1993).

II

RCRA is a comprehensive environmental statute that empowers EPA to regulate hazardous wastes from cradle to grave, in accordance with the rigorous safeguards and waste management procedures of Subtitle C, 42 U. S. C. §§ 6921–6934. (Nonhazardous wastes are regulated much more loosely under Subtitle D, 42 U. S. C. §§ 6941–6949.) Under

the relevant provisions of Subtitle C, EPA has promulgated standards governing hazardous waste generators and transporters, see 42 U. S. C. §§ 6922 and 6923, and owners and operators of hazardous waste treatment, storage, and disposal facilities (TSDF's), see § 6924. Pursuant to § 6922, EPA has directed hazardous waste generators to comply with handling, recordkeeping, storage, and monitoring requirements, see 40 CFR pt. 262 (1993). TSDF's, however, are subject to much more stringent regulation than either generators or transporters, including a 4- to 5-year permitting process, see 42 U. S. C. § 6925; 40 CFR pt. 270 (1993); U. S. Environmental Protection Agency Office of Solid Waste and Emergency Response, The Nation's Hazardous Waste Management Program at a Crossroads, The RCRA Implementation Study 49–50 (July 1990), burdensome financial assurance requirements, stringent design and location standards, and, perhaps most onerous of all, responsibility to take corrective action for releases of hazardous substances and to ensure safe closure of each facility, see 42 U. S. C. § 6924; 40 CFR pt. 264 (1993). "[The] corrective action requirement is one of the major reasons that generators and transporters work diligently to manage their wastes so as to avoid the need to obtain interim status or a TSD permit." 3 Environmental Law Practice Guide § 29.06[3][d] (M. Gerrard ed. 1993) (hereinafter Practice Guide).

RCRA does not identify which wastes are hazardous and therefore subject to Subtitle C regulation; it leaves that designation to EPA. 42 U. S. C. § 6921(a). When EPA's hazardous waste designations for solid wastes appeared in 1980, see 45 Fed. Reg. 33084, they contained certain exceptions from normal coverage, including an exclusion for "household waste," defined as "any waste material . . . derived from households (including single and multiple residences, hotels and motels)," id., at 33120, codified as amended at 40 CFR § 261.4(b)(1) (1993). Although most household waste is harmless, a small portion—such as cleaning fluids

and batteries—would have qualified as hazardous waste. The regulation declared, however, that "[h]ousehold waste, including household waste that has been collected, transported, stored, treated, disposed, recovered (e. g., refuse-derived fuel) or reused" is not hazardous waste. *Ibid.* Moreover, the preamble to the 1980 regulations stated that "residues remaining after treatment (*e. g.* incineration, thermal treatment) [of household waste] are not subject to regulation as a hazardous waste." 45 Fed. Reg. 33099. By reason of these provisions, an incinerator that burned only household waste would not be considered a Subtitle C TSDF, since it processed only nonhazardous (*i. e.*, household) waste, and it would not be considered a Subtitle C generator of hazardous waste and would be free to dispose of its ash in a Subtitle D landfill.

The 1980 regulations thus provided what is known as a "waste stream" exemption for household waste, *ibid., i. e.,* an exemption covering that category of waste from generation through treatment to final disposal of residues. The regulation did not, however, exempt MWC ash from Subtitle C coverage if the incinerator that produced the ash burned anything *in addition to* household waste, such as what petitioners' facility burns: nonhazardous industrial waste. Thus, a facility like petitioners' would qualify as a Subtitle C hazardous waste generator if the MWC ash it produced was sufficiently toxic, see 40 CFR §§ 261.3, 261.24 (1993)—though it would still not qualify as a Subtitle C TSDF, since all the waste it took in would be characterized as nonhazardous. (An ash can be hazardous, even though the product from which it is generated is not, because in the new medium the contaminants are more concentrated and more readily leachable, see 40 CFR §§ 261.3, 261.24, and pt. 261, App. II (1993).)

Four years after these regulations were issued, Congress enacted the Hazardous and Solid Waste Amendments of 1984, Pub. L. 98–616, 98 Stat. 3221, which added to RCRA

the "Clarification of Household Waste Exclusion" as § 3001(i), § 223, 98 Stat. 3252. The essence of our task in this case is to determine whether, under that provision, the MWC ash generated by petitioners' facility—a facility that would have been considered a Subtitle C generator under the 1980 regulations—is subject to regulation as hazardous waste under Subtitle C. We conclude that it is.

Section 3001(i), 42 U. S. C. § 6921(i), entitled "Clarification of household waste exclusion," provides:

> "A resource recovery facility recovering energy from the mass burning of municipal solid waste shall not be deemed to be treating, storing, disposing of, or otherwise managing hazardous wastes for the purposes of regulation under this subchapter, if—
> "(1) such facility—
> "(A) receives and burns only—
> "(i) household waste (from single and multiple dwellings, hotels, motels, and other residential sources), and
> "(ii) solid waste from commercial or industrial sources that does not contain hazardous waste identified or listed under this section, and
> "(B) does not accept hazardous wastes identified or listed under this section, and
> "(2) the owner or operator of such facility has established contractual requirements or other appropriate notification or inspection procedures to assure that hazardous wastes are not received at or burned in such facility."

The plain meaning of this language is that so long as a facility recovers energy by incineration of the appropriate wastes, *it* (the *facility*) is not subject to Subtitle C regulation as a facility that treats, stores, disposes of, or manages hazardous waste. The provision quite clearly does *not* contain any exclusion for the *ash itself.* Indeed, the waste the facility produces (as opposed to that which it receives) is not even

mentioned. There is thus no express support for petitioners' claim of a waste-stream exemption.[1]

Petitioners contend, however, that the practical effect of the statutory language is to exempt the ash by virtue of exempting the facility. If, they argue, the facility is not deemed to be treating, storing, or disposing of hazardous waste, then the ash that it treats, stores, or disposes of must itself be considered nonhazardous. There are several problems with this argument. First, as we have explained, the only exemption provided by the terms of the statute is for the *facility*. It is the facility, *not the ash,* that "shall not be deemed" to be subject to regulation under Subtitle C. *Unlike* the preamble to the 1980 regulations, which had been in existence for four years by the time § 3001(i) was enacted, § 3001(i) does not explicitly exempt MWC ash generated by a resource recovery facility from regulation as a hazardous waste. In light of that difference, and given the statute's express declaration of national policy that "[w]aste that is . . . generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment," 42 U. S. C. § 6902(b), we cannot interpret the statute to permit MWC ash sufficiently toxic to qualify as hazardous to be disposed of in ordinary landfills.

Moreover, as the Court of Appeals observed, the statutory language does not even exempt the *facility* in its capacity as

---

[1] The dissent is able to describe the provision as exempting the ash itself only by resorting to what might be called imaginative use of ellipsis: "even though the material being treated and disposed of contains hazardous components before, during, and after its treatment[,] that material 'shall not be deemed to be . . . hazardous.'" *Post,* at 346. In the full text, quoted above, the subject of the phrase "shall not be deemed . . . hazardous" is *not* the material, but the *resource recovery facility,* and the complete phrase, including (italicized) the ellipsis, reads "shall not be deemed to be *treating, storing, disposing of, or otherwise managing* hazardous *wastes.*" Deeming a facility not to be engaged in these activities with respect to hazardous wastes is of course quite different from deeming the output of that facility not to be hazardous.

a *generator* of hazardous waste. RCRA defines "generation" as "the act or process of producing hazardous waste." 42 U. S. C. § 6903(6). There can be no question that the creation of ash by incinerating municipal waste constitutes "generation" of hazardous waste (assuming, of course, that the ash qualifies as hazardous under 42 U. S. C. § 6921 and its implementing regulations, 40 CFR pt. 261 (1993)). Yet although § 3001(i) states that the exempted facility "shall not be deemed to be treating, storing, disposing of, or otherwise managing hazardous wastes," it significantly omits from the catalog the word *"generating."* Petitioners say that because the activities listed as exempt encompass the full scope of the facility's operation, the failure to mention the activity of generating is insignificant. But the statute itself refutes this. Each of the three specific terms used in § 3001(i)— "treating," "storing," and "disposing of"—is separately defined by RCRA, and none covers the production of hazardous waste.[2] The fourth and less specific term ("otherwise managing") is also defined, to mean "collection, source separation, storage, transportation, processing, treatment, recovery, and disposal," 42 U. S. C. § 6903(7)—just about every hazardous waste-related activity *except* generation. We

---

[2] "Treatment" means "any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous." 42 U. S. C. § 6903(34).

"Storage" means "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste." § 6903(33).

"Disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters." § 6903(3).

think it follows from the carefully constructed text of § 3001(i) that while a resource recovery facility's management activities are excluded from Subtitle C regulation, its generation of toxic ash is not.

Petitioners appeal to the legislative history of § 3001(i), which includes, in the Senate Committee Report, the statement that "[a]ll waste management activities of such a facility, including the *generation*, transportation, treatment, storage and disposal of waste shall be covered by the exclusion." S. Rep. No. 98–284, p. 61 (1983) (emphasis added). But it is the statute, and not the Committee Report, which is the authoritative expression of the law, and the statute prominently *omits* reference to generation. As the Court of Appeals cogently put it: "Why should we, then, rely upon a single word in a committee report that did not result in legislation? Simply put, we shouldn't." 948 F. 2d, at 351.[3] Petitioners point out that the activity by which they "treat" municipal waste is the very same activity by which they "generate" MWC ash, to wit, incineration. But there is nothing extraordinary about an activity's being exempt for some purposes and nonexempt for others. The incineration here is exempt from TSDF regulation, but subject to regulation as hazardous waste generation. (As we have noted, see *supra*, at 331–332, the latter is much less onerous.)

Our interpretation is confirmed by comparing § 3001(i) with another statutory exemption in RCRA. In the Superfund Amendments and Reauthorization Act of 1986, Pub. L. 99–499, § 124(b), 100 Stat. 1689, Congress amended 42 U. S. C. § 6921 to provide that an "owner and operator of equipment used to recover methane from a landfill shall not be deemed to be managing, generating, transporting, treating, storing, or disposing of hazardous or liquid wastes within

---

[3] Nothing in the dissent's somewhat lengthier discourse on § 3001(i)'s legislative history, see *post*, at 343–345, convinces us that the statute's omission of the term "generation" is a scrivener's error.

the meaning of" Subtitle C. This provision, in contrast to § 3001(i), provides a complete exemption by including the term "generating" in its list of covered activities. "[I]t is generally presumed that Congress acts intentionally and purposely" when it "includes particular language in one section of a statute but omits it in another," *Keene Corp.* v. *United States*, 508 U. S. 200, 208 (1993) (internal quotation marks omitted). We agree with respondents that this provision "shows that Congress knew how to draft a waste stream exemption in RCRA when it wanted to." Brief for Respondents 18.

Petitioners contend that our interpretation of § 3001(i) turns the provision into an "empty gesture," Brief for Petitioners 23, since even under the pre-existing regime an incinerator burning household waste and nonhazardous industrial waste was exempt from the Subtitle C TSDF provisions. If § 3001(i) did not extend the waste-stream exemption to the product of such a combined household/nonhazardous-industrial treatment facility, petitioners argue, it did nothing at all. But it is not nothing to codify a household waste exemption that had previously been subject to agency revision; nor is it nothing (though petitioners may value it as less than nothing) to *restrict* the exemption that the agency previously provided—which is what the provision here achieved, by withholding all waste-stream exemption for waste processed by resource recovery facilities, even for the waste stream passing through an exclusively household waste facility.[4]

---

[4] We express no opinion as to the validity of EPA's household waste regulation as applied to resource recovery facilities *before* the effective date of § 3001(i). Furthermore, since the statute in question addresses only resource recovery facilities, not household waste in general, we are unable to reach any conclusions concerning the validity of EPA's regulatory scheme for household wastes *not* processed by resource recovery facilities.

We also do not agree with petitioners' contention that our construction renders § 3001(i) ineffective for its intended purpose of promoting household/nonhazardous-industrial resource recovery facilities, see 42 U. S. C. §§ 6902(a)(1), (10), (11), by subjecting them "to the potentially enormous expense of managing ash residue as a hazardous waste." Brief for Petitioners 20. It is simply not true that a facility which is (as our interpretation says these facilities are) a hazardous waste "generator" is also deemed to be "managing" hazardous waste under RCRA. Section 3001(i) clearly exempts these facilities from Subtitle C TSDF regulations, thus enabling them to avoid the "full brunt of EPA's enforcement efforts under RCRA." Practice Guide § 29.05[1].

\* \* \*

RCRA's twin goals of encouraging resource recovery and protecting against contamination sometimes conflict. It is not unusual for legislation to contain diverse purposes that must be reconciled, and the most reliable guide for that task is the enacted text. Here that requires us to reject the Solicitor General's plea for deference to the EPA's interpretation, cf. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843–844 (1984), which goes beyond the scope of whatever ambiguity § 3001(i) contains. See *John Hancock Mut. Life Ins. Co.* v. *Harris Trust & Sav. Bank*, 510 U. S. 86, 109 (1993). Section 3001(i) simply cannot be read to contain the cost-saving waste-stream exemption petitioners seek.[5]

For the foregoing reasons, the judgment of the Court of Appeals for the Seventh Circuit is

*Affirmed.*

---

[5] In view of our construction of § 3001(i), we need not consider whether an agency interpretation expressed in a memorandum like the Administrator's in this case is entitled to any less deference under *Chevron* than an interpretation adopted by rule published in the Federal Register, or by adjudication.

JUSTICE STEVENS, with whom JUSTICE O'CONNOR joins, dissenting.

The statutory provision in question is a 1984 amendment entitled "Clarification of Household Waste Exclusion."[1] To understand that clarification, we must first examine the "waste exclusion" that the amendment clarified and, more particularly, the ambiguity that needed clarification. I therefore begin with a discussion of the relevant pre-1984 law. I then examine the text of the statute as amended and explain why the apparent tension between the broad definition of the term "hazardous waste generation" in the 1976 Act and the more specific exclusion for the activity of incinerating household wastes (and mixtures of household and other nonhazardous wastes) in the 1984 amendment should be resolved by giving effect to the later enactment.

I

When Congress enacted the Resource Conservation and Recovery Act of 1976 (RCRA), it delegated to the Environmental Protection Agency (EPA) vast regulatory authority over the mountains of garbage that our society generates. The statute directed the EPA to classify waste as hazardous or nonhazardous and to establish regulatory controls over the disposition of the two categories of waste pursuant to Subtitles C and D of RCRA. 42 U. S. C. § 6921(a); see *ante*, at 331–332. To that end, the EPA in 1980 promulgated detailed regulations establishing a federal hazardous waste management system pursuant to Subtitle C.

Generally, though not always, the EPA regulations assume that waste is properly characterized as hazardous or nonhazardous when it first becomes waste. Based on that charac-

---

[1] Section 223 of the Hazardous and Solid Waste Amendments of 1984 amended § 3001 of the Resource Conservation and Recovery Act of 1976. See 98 Stat. 3252; 42 U. S. C. § 6921(i). The text of the provision is quoted *ante*, at 334.

terization, the waste is regulated under either Subtitle C or D. Household waste is regarded as nonhazardous when it is first discarded and, as long as it is not mixed with hazardous waste, it retains that characterization during and after its treatment and disposal. Even though it contains some materials that would be classified as hazardous in other contexts, and even though its treatment may produce a residue that contains a higher concentration of hazardous matter than when the garbage was originally discarded, such waste is regulated as nonhazardous waste under Subtitle D. See *ante,* at 332–333. Thus, an incinerator that burns nothing but household waste might "generate" tons of hazardous residue, but as a statutory matter it still is deemed to be processing nonhazardous waste and is regulated as a Subtitle D, rather than Subtitle C, facility.

Section 261.4(b)(1) of the EPA's 1980 regulations first established the household waste exclusion. See 45 Fed. Reg. 33120 (1980). The relevant text of that regulation simply provided that solid wastes derived from households (including single and multiple residences, hotels, and motels) were "not hazardous wastes."[2] The regulation itself said nothing about the status of the residue that remains after the incineration of such household waste. An accompanying comment, however, unambiguously explained that "residues remaining after treatment (*e. g.* incineration, thermal treatment) are not subject to regulation as hazardous waste." *Id.,* at 33099. Thus, the administrative history of the 1980

---

[2] The full text of 40 CFR § 261.4(b)(1) (1993) reads as follows:

"(b) *Solid Wastes which are not hazardous wastes.* The following solid wastes are not hazardous wastes:

"(1) Household waste, including household waste that has been collected, transported, stored, treated, disposed, recovered (*e. g.,* refuse-derived fuel) or reused. 'Household waste' means any waste material (including garbage, trash and sanitary wastes in septic tanks) derived from households (including single and multiple residences, hotels and motels)."

regulation, rather than its text, revealed why a municipal incinerator burning household waste was not treated as a generator of hazardous waste.

The EPA's explanatory comment contained an important warning: If household waste was "mixed with other hazardous wastes," the entire mixture would be deemed hazardous.[3] Yet neither the comment nor the regulation itself identified the consequences of mixing household waste with other wastes that are entirely *nonhazardous*.[4] Presumably such a mixture would contain a lower percentage of hazardous material than pure household waste, and therefore should also be classified as nonhazardous—assumptions that are not inconsistent with the EPA's warning that mixing household waste "with other *hazardous* wastes" would terminate the household waste exemption. The EPA's failure to comment expressly on the significance of adding 100 percent nonhazardous commercial or industrial waste nevertheless warranted further clarification.

Congress enacted that clarification in 1984. Elaborating upon the EPA's warning in 1980, the text of the 1984 amendment—§ 3001(i) of RCRA, 42 U. S. C. § 6921(i)—made clear that a facility treating a mixture of household waste and "solid waste from commercial or industrial sources that does not contain hazardous waste," § 6921(i)(1)(A)(ii), shall not be

---

[3] "When household waste is mixed with other hazardous wastes, however, the entire mixture will be deemed hazardous in accord with § 261.3(a)(2)(ii) of these regulations except when they are mixed with hazardous wastes produced by small quantity generators (see § 261.5). While household waste may not be hazardous per se, it is like any other solid waste. Thus a mixture of household and hazardous (except those just noted) wastes is also regulated as a hazardous waste under these regulations." 45 Fed. Reg. 33099 (1980).

[4] In this regard, because the regulations left unexplained the ramifications of mixing household waste with nonhousehold waste that is not hazardous, the Court errs by asserting unqualifiedly that the Chicago incinerator "would have been considered a Subtitle C generator under the 1980 regulations." *Ante*, at 334.

deemed to be treating hazardous waste. In other words, the addition of *non*hazardous waste derived from other sources does not extinguish the household waste exclusion.

The parallel between the 1980 regulation and the 1984 statutory amendment is striking. In 1980 the EPA referred to the exclusion of household waste "in all phases of its management."[5] Similarly, the 1984 statute lists *all phases* of the incinerator's management when it states that a facility recovering energy from the mass burning of a mixture of household waste and other solid waste that does not contain hazardous waste "shall not be deemed to be treating, storing, disposing of, or otherwise managing hazardous wastes." See 42 U. S. C. § 6921(i). Even though that text only refers to the exemption of the facility that burns the waste, the title of the section significantly characterizes it as a *waste* exclusion. Moreover, the title's description of the amendment as a "clarification" identifies an intent to codify its counterpart in the 1980 regulation.

The Report of the Senate Committee that recommended the enactment of § 3001(i) demonstrates that the sponsors of the legislation understood it to have the same meaning as the 1980 EPA regulation that it "clarified." That Report, which is worth setting out in some detail, first notes that the reported bill adds the amendment to § 3001 "to clarify the coverage of the household waste exclusion with respect to resource recovery facilities recovering energy through the mass burning of municipal solid waste." S. Rep. No. 98–284, p. 61 (1983). The EPA had promulgated the exclusion "in its hazardous waste management regulations established to exclude waste streams generated by consumers at the household level and by sources whose wastes are sufficiently simi-

---

[5] "Since household waste is excluded in all phases of its management, residues remaining after treatment (*e. g.* incineration, thermal treatment) are not subject to regulation as hazardous waste." 45 Fed. Reg. 33099 (1980).

lar in both quantity and quality to those of households."
*Ibid.* The Report explains that resource recovery facilities
frequently take in household wastes that are mixed with
other nonhazardous waste streams from a variety of com-
mercial and industrial sources, and emphasizes the impor-
tance of encouraging commercially viable resource recovery
facilities. *Ibid.* To that end, "[n]ew section [3001(i)] clari-
fies the original intent to include within the household waste
exclusion activities of a resource recovery facility which
recovers energy from the mass burning of household waste
and non-hazardous waste from other sources." *Ibid.* The
Report further explains:

> "All waste management activities of such a facility, in-
> cluding the generation, transportation, treatment, stor-
> age and disposal of waste shall be covered by the exclu-
> sion, if the limitations in paragraphs (1) and (2) of [the
> amendment] are met. First, such facilities must receive
> and burn only household waste and solid waste from
> other sources which does not contain hazardous waste
> identified or listed under section 3001.
>
> "Second, such facilities cannot accept hazardous wastes
> identified or listed under section 3001 from commercial
> or industrial sources, and must establish contractual
> requirements or other notification or inspection pro-
> cedures to assure that such wastes are not received or
> burned. This provision requires precautionary meas-
> ures or procedures which can be shown to be effective
> safeguards against the unintended acceptance of hazard-
> ous waste. If such measures are in place, a resource
> recovery facility whose activities would normally be
> covered by the household waste exclusion should not be
> penalized for the occasional, inadvertent receipt and
> burning of hazardous material from such commercial or
> industrial sources. Facilities must monitor the waste
> they receive and, if necessary, revise the precautionary

measures they establish to assure against the receipt of such hazardous waste." *Ibid.*

These comments referred to the Senate bill that became law after a majority of the Senate followed the Committee's recommendation "that the bill (as amended) do pass." *Id.,* at 1.[6]  Given this commentary, it is quite unrealistic to assume that the omission of the word "generating" from the particularized description of management activities in the statute was intended to render the statutory description any less inclusive than either the 1980 regulation or the Committee Report.   It is even more unrealistic to assume that legislators voting on the 1984 amendment would have detected any difference between the statutory text and the Committee's summary just because the term "generating" does not appear in the 1984 amendment.   A commonsense reading of the statutory text in the light of the Committee Report and against the background of the 1980 regulation reveals an obvious purpose to *preserve,* not to change, the existing rule.[7]

---

[6] The Conference Committee adopted the Senate amendment verbatim. Its Report stated: "The Senate amendment clarifies that an energy recovery facility is exempt from hazardous waste requirements if it burns only residential and non-hazardous commercial wastes and establishes procedures to assure hazardous wastes will not be burned at the facility." H. R. Conf. Rep. No. 98–1133, p. 106 (1984).

[7] The majority's refusal to attach significance to "'a single word in a committee report,'" *ante,* at 337, reveals either a misunderstanding of, or a lack of respect for, the function of legislative committees.   The purpose of a committee report is to provide the Members of Congress who have not taken part in the committee's deliberations with a summary of the provisions of the bill and the reasons for the committee's recommendation that the bill should become law.   The report obviously does not have the force of law.   Yet when the text of a bill is not changed after it leaves the committee, the Members are entitled to assume that the report fairly summarizes the proposed legislation.   What makes this Report significant is not the single word "generation," but the unmistakable intent to maintain an existing rule of law.   The omission of the single word "generating" from the statute has no more significance than the omission of the same word from the text of the 1980 regulation.

## II

The relevant statutory text is not as unambiguous as the Court asserts. There is substantial tension between the broad definition of the term "hazardous waste generation" in § 1004(6) of RCRA and the household waste exclusion codified by the 1984 amendment: Both provisions can be read to describe the same activity. The former "means the act or process of producing hazardous waste." 90 Stat. 2799; 42 U. S. C. § 6903(6). Read literally, that definition is broad enough to encompass the burning of pure household waste that produces some hazardous residue. The only statutory escape from that conclusion is the 1984 amendment that provides an exemption for the activity of burning household waste. Yet that exemption does not distinguish between pure household waste, on the one hand, and a mixture of household and other nonhazardous wastes, on the other. It either exempts both the pure stream and the mixture, or it exempts neither.

Indeed, commercial and industrial waste is by definition nonhazardous: In order for it to fall within the exclusion created by the 1984 amendment, it must not contain hazardous components. As a consequence, the only aspect of this waste stream that would ordinarily be regulated by Subtitle C of RCRA is the ash residue. EPA could reasonably conclude, therefore, that to give any content to the statute with respect to this component of the waste stream, the incinerator ash must be exempted from Subtitle C regulation.

The exemption states that a facility burning solid waste "shall not be deemed to be treating, storing, disposing of, or otherwise managing hazardous wastes for the purposes of regulation under this subchapter" if two conditions are satisfied. See *ante*, at 334. As long as the two conditions are met—even though the material being treated and disposed of contains hazardous components before, during, and after its treatment—that material "shall not be deemed to be . . . hazardous." By characterizing both the input and the out-

put as not hazardous, the 1984 amendment excludes the activity from the definition of hazardous waste generation that would otherwise apply. For it is obvious that the same activity cannot both subject a facility to regulation because its residue is hazardous and exempt the facility from regulation because the statute deems the same residue to be nonhazardous.[8]

Thus, if we are to be guided only by the literal meaning of the statutory text, we must either give effect to the broad definition of hazardous waste generation and subject all municipal incinerators that generate hazardous ash to Subtitle C regulation (including those that burn pure household waste) or give effect to the exclusion that applies equally to pure household waste and mixtures that include other nonhazardous wastes. For several reasons the latter is the proper choice. It effectuates the narrower and more recently enacted provision rather than the earlier more general definition. It respects the title of the 1984 amendment by treating what follows as a "clarification" rather than a repeal or a modification. It avoids the Court's rather surprising (and uninvited) decision to invalidate the household waste exclusion that the EPA adopted in 1980,[9] on which

---

[8] The Court characterizes my reading of the text as "imaginative use of ellipsis," *ante*, at 335, n. 1, because the subject of the predicate "shall not be deemed to be . . . hazardous" is the recovery facility rather than the residue that is disposed of after the waste is burned. That is true, but the reason the facility is exempted is because it is not "deemed to be . . . disposing of . . . hazardous wastes." Thus it is the statutorily deemed nonhazardous character of the object of the sentence—wastes—that effectively exempts from Subtitle C regulation the activity and the facility engaged in that, activity. If, as the statute provides, a facility is not deemed to be disposing of hazardous wastes when it disposes of the output of the facility, it must be true that the output is deemed nonhazardous.

[9] Although the first nine pages of the Court's opinion give the reader the impression that the 1980 regulatory exclusion for pure household waste was valid, the Court ultimately acknowledges that its construction of the statute has the effect of "withholding all waste-stream exemption for waste processed by resource recovery facilities, even for the waste

municipalities throughout the Nation have reasonably relied for over a decade.[10] It explains why the legislative history fails to mention an intent to impose significant new burdens on the operation of municipal incinerators. Finally, it is the construction that the EPA has adopted and that reasonable jurists have accepted.[11]

The majority's decision today may represent sound policy. Requiring cities to spend the necessary funds to dispose of their incinerator residues in accordance with the strict requirements of Subtitle C will provide additional protections to the environment. It is also true, however, that the conservation of scarce landfill space and the encouragement of the recovery of energy and valuable materials in municipal wastes were major concerns motivating RCRA's enactment. Whether those purposes will be disserved by regulating municipal incinerators under Subtitle C and, if so, whether environmental benefits may nevertheless justify the costs of such additional regulation are questions of policy that we are not competent to resolve. Those questions are precisely the kind that Congress has directed the EPA to answer. The

---

stream passing through an exclusively household waste facility." *Ante,* at 338. Of course, it is not the 1984 amendment that casts doubt on the validity of the regulation, see *ante,* at 338, n. 4, but the Court's rigid reading of § 1004(6)'s definition of the term "hazardous waste generation" that has achieved that result. Since that definition has been in RCRA since 1976, the Court utterly fails to explain how the 1984 amendment made any change in the law.

[10] At oral argument Government counsel advised us that the Chicago incinerator is one of about 150 comparable facilities in the country and that the EPA has never contended that the acceptance of nonhazardous commercial waste subjected any of them to regulation under Subtitle C. Tr. of Oral Arg. 25.

[11] See specially Judge Haight's comprehensive opinion in *Environmental Defense Fund, Inc.* v. *Wheelabrator Technologies, Inc.,* 725 F. Supp. 758 (SDNY 1989), aff'd, 931 F. 2d 211 (CA2 1991). That decision is cited with approval by Circuit Judge Ripple, 985 F. 2d 303, 305 (CA7 1993) (dissenting opinion); *Environmental Defense Fund, Inc.* v. *Chicago,* 948 F. 2d 345, 352 (CA7 1991) (dissenting opinion), in this litigation.

EPA's position, first adopted unambiguously in 1980 and still maintained today,[12] was and remains a correct and permissible interpretation of the EPA's broad congressional mandate.

Accordingly, I respectfully dissent.

---

[12] Although there has been some ambivalence in the EPA's views since 1985, see 725 F. Supp., at 766–768, there is no ambiguity or equivocation in either its original or its present interpretation of RCRA.