McCULLOUGH, Judge.
 

 *222
 
 Petitioner WASCO LLC (WASCO) appeals from the final order and judgment in which the trial court affirmed the administrative law judge's (ALJ) denial of WASCO's motion for continuance and affirmed the ALJ's grant of summary judgment in favor of respondent North Carolina Department of Environment and Natural Resources (the "Department"), Division of Waste Management (the "Division"). For the following reasons, we affirm.
 

 *223
 
 I.
 
 Background
 

 This appeal is the result of a petition for a contested case hearing filed by WASCO in the Office of Administrative Hearings on 27 September 2013. In the petition, WASCO sought a declaration that it was not an "operator" of a former textile manufacturing facility located at 850 Warren Wilson Road in
 
 *407
 
 Swannanoa, North Carolina (the "Site"), and, therefore, not responsible for remedial cleanup efforts required by federal and state laws governing the management of hazardous wastes. Those laws include portions of the Resource Conservation and Recovery Act, as amended (RCRA),
 
 42 U.S.C. §§ 6901
 
 - 6992, federal regulations, and North Carolina's Hazardous Waste Program (the "State Hazardous Waste Program").
 

 As the United States Supreme Court clearly explained,
 

 RCRA is a comprehensive environmental statute that empowers [the Environmental Protection Agency (EPA) ] to regulate hazardous wastes from cradle to grave, in accordance with the rigorous safeguards and waste management procedures of Subtitle C,
 
 42 USC §§ 6921
 
 - 6934. (Nonhazardous wastes are regulated much more loosely under Subtitle D,
 
 42 USC §§ 6941
 
 - 6949.) Under the relevant provisions of Subtitle C, EPA has promulgated standards governing hazardous waste generators and transporters,
 
 see
 

 42 USC §§ 6922
 
 and 6923, and owners and operators of hazardous waste treatment, storage, and disposal facilities (TSDF's),
 
 see
 
 § 6924. Pursuant to § 6922, EPA has directed hazardous waste generators to comply with handling, recordkeeping, storage, and monitoring requirements,
 
 see
 
 40 CFR pt 262 (1993). TSDF's, however, are subject to much more stringent regulation than either generators or transporters, including a 4 to 5-year permitting process,
 
 see
 

 42 USC § 6925
 
 ; 40 CFR pt 270 (1993); US Environmental Protection Agency Office of Solid Waste and Emergency Response, The Nation's Hazardous Waste Management Program at a Crossroads, The RCRA Implementation Study 49-50 (July 1990), burdensome financial assurance requirements, stringent design and location standards, and, perhaps most onerous of all, responsibility to take corrective action for releases of hazardous substances and to ensure safe closure of each facility,
 
 see
 

 42 USC § 6924
 
 ; 40 CFR pt 264 (1993).
 

 *224
 

 City of Chicago v. Envtl. Def. Fund
 
 ,
 
 511 U.S. 328
 
 , 331-32,
 
 114 S.Ct. 1588
 
 , 1590,
 
 128 L.Ed.2d 302
 
 , 307-308 (1994).
 

 In lieu of the federal program, RCRA allows states to develop, administer, and enforce their own hazardous waste programs, subject to authorization by EPA.
 
 See
 

 42 U.S.C. § 6926
 
 (2016). State programs must meet the minimum requirements of RCRA.
 
 Id
 
 . (requiring state programs to be "equivalent" to the federal hazardous waste program). EPA granted North Carolina final authorization to operate the State Hazardous Waste Program in 1984.
 
 See
 

 49 Fed. Reg. 48694
 
 -01 (Dec. 14, 1984).
 

 The State Hazardous Waste Program is administered by the Division's Hazardous Waste Section (the "Section").
 
 See
 
 15A N.C. Admin. Code 13A.0101(a) (2016). The State Hazardous Waste Program consists of portions of the North Carolina Solid Waste Management Act (the "State Solid Waste Management Act"), Article 9 of Chapter 130A of the General Statutes, and related state rules and regulations. Specifically, Part 2 of the State Solid Waste Management Act concerns "Solid and Hazardous Waste Management" and requires that rules establishing a complete and integrated regulatory scheme in the area of hazardous waste management be adopted and enforced.
 
 See
 
 N.C. Gen. Stat. § 130A-294(c) (2015). North Carolina's Hazardous Waste Management Rules (the "State Hazardous Waste Rules") are found in Title 15A, Subchapter 13A of the N.C. Administrative Code. The State Hazardous Waste Rules largely incorporate the federal regulations under RCRA by reference.
 

 Pertinent to the present case, the State Hazardous Waste Rules adopt closure and post-closure standards for owners and operators of hazardous waste TSDF's from subpart G of the federal regulations.
 
 See
 
 15A N.C. Admin. Code 13A.0109(h) (incorporating by reference
 
 40 C.F.R. §§ 264.110
 
 through 264.120 ). The State Hazardous Waste Rules also implement a hazardous waste permit program, which incorporates much of the federal hazardous waste permit program, with added "Part B" information requirements.
 
 See
 
 15A N.C. Admin. Code 13A.0113 (incorporating by reference portions of 40 C.F.R. Ch. 1, Subch. I, Pt. 270,).
 

 40 C.F.R. § 270.1
 
 (c) is one of those sections of the federal hazardous waste permit
 
 *408
 
 program incorporated by reference in 15A N.C. Admin. Code 13A.0113(a). That section provides, in pertinent part, that
 

 [o]wners and operators of surface impoundments, landfills, land treatment units, and waste pile units that received waste after July 26, 1982, or that certified closure (according to § 265.115 of this chapter) after January 26, 1983, must have post-closure permits, unless they demonstrate
 
 *225
 
 closure by removal or decontamination as provided under § 270.1(c)(5) and (6), or obtain an enforceable document in lieu of a post-closure permit, as provided under paragraph (c)(7) of this section. If a post-closure permit is required, the permit must address applicable 40 CFR part 264 groundwater monitoring, unsaturated zone monitoring, corrective action, and post-closure care requirements of this chapter.
 

 40 C.F.R. § 270.1
 
 (c) (2017). It is WASCO's responsibility to obtain a post-closure permit for the Site that is at issue in the present case.
 

 As mentioned above, the Site is a former textile manufacturing facility located at 850 Warren Wilson Road in Swannanoa, North Carolina. Years before WASCO became involved with the Site, Asheville Dyeing & Finishing (AD&F), a division of Winston Mills, Inc., operated a knitwear business on the Site. During the operation of the knitwear business, underground tanks were used to store virgin and waste perchloroethylene (PCE), a dry cleaning solvent. At some point prior to 1985, PCE leaked from the tanks and contaminated the soil. The storage tanks were excavated by Winston Mills in 1985 and the resulting pits were backfilled with the contaminated soil left in place.
 

 In 1990, Winston Mills and the Section entered into an Administrative Order on Consent that set forth a detailed plan to close the Site. Winston Mills completed the closure plan to close the Site as a landfill in 1992 and the Section accepted certifications of closure in a 1993 letter to Winston Mills.
 

 Winston Mills and its parent corporation, McGregor Corporation, sold the site to Anvil Knitwear, Inc., in 1995. In connection with the sale, Winston Mills provided Anvil Knitwear indemnification rights for "environmental requirements." Culligan International Company (Culligan) co-guaranteed Winston Mills' performance of indemnification for environmental liabilities.
 

 WASCO became involved in 1998 when its predecessor in interest, United States Filter Corporation, acquired stock of Culligan Water Technologies, Inc., which owned Culligan. Thereafter, WASCO provided financial assurances to the Section on behalf of Culligan in the form of a trust fund to the benefit of the Department and an irrevocable standby letter of credit for the account of AD&F.
 

 WASCO divested itself of Culligan in 2004. As part of the sale of Culligan, WASCO agreed to indemnify the buyer as to identified
 
 *226
 
 environmental issues at the Site. At that time, a letter from Culligan to the Section represented that WASCO was assuming Culligan's remediation responsibilities at the Site and directing further communications to WASCO's director of environmental affairs. Subsequent communications between WASCO and the Section show that WASCO did intend to take on those responsibilities and that the Section identified WASCO as the responsible party. Additionally, Part A permit applications signed by WASCO's director of environmental affairs identified WASCO as the operator and WASCO continued to pay consultants and take action at the Site.
 

 In 2007, WASCO received a letter from the Section that the Site was included on a list of facilities needing corrective action. A follow-up letter from the Section soon thereafter indicated that additional action was needed to develop a groundwater assessment plan to address the migration of hazardous waste in the groundwater. This expanded the size of the area with which WASCO was dealing to off-site locations. WASCO, its consultant, and the Section continued to work together to address a groundwater plan.
 

 In 2008, Anvil Knitwear sold the property to Dyna-Diggr, LLC. Thereafter, responsibility for compliance with the State Hazardous Waste Program became an issue, with both WASCO and Anvil disclaiming responsibility. WASCO asserted it participated in post-closure actions on a voluntary basis.
 

 *409
 
 In an 16 August 2013 letter, the Section detailed its positions that Dyna-Diggr is liable as an owner and that WASCO is independently liable as an operator. The Section sought cooperation between all parties and suggested it "would be willing to enter into a modified Joint Administrative Order on Consent in Lieu of a Post-Closure Permit pursuant to which the two parties agree to undertake part of the post-closure responsibilities[.]" However, in the alternative, the Section reminded the parties that it "always has the option of issuing a Compliance Order with Administrative Penalty to both parties for violation of 40 CFR 270.1(c) and associated post-closure regulations." This action resulted in WASCO filing the 27 September 2013 petition.
 

 Following the filing of the petition, on 25 September 2014, the Section filed a motion for summary judgment on all claims raised in WASCO's petition. After the ALJ denied WASCO's motion for a continuance regarding the summary judgment motion by order filed 28 October 2014, the ALJ filed his final decision granting the Section's motion for summary judgment on 2 January 2015.
 

 *227
 
 On 2 February 2015, WASCO filed a petition for judicial review (the "PJR") of both orders. After both parties filed briefs regarding the PJR, the matter came on for hearing in Wake County Superior Court on 12 October 2015 before the Honorable G. Bryan Collins, Jr.
 

 On 23 October 2015, the court filed its "Final Order and Judgment on Rule 56(f) Motion and Petition for Judicial Review." The court concluded, "[a]s a matter of law, WASCO is an operator of a landfill for purposes of the State Hazardous Waste Program's post-closure permitting requirement." Therefore, the court affirmed the 2 January 2015 final decision of the ALJ granting summary judgment in favor of the respondent and denied WASCO's PJR. In the decretal portion of the court's order, the court reiterated that "WASCO is an 'operator' for purposes of
 
 40 C.F.R. § 270.1
 
 (c) (adopted by reference in 15A [N.C. Admin. Code] 13A.0113(a) ) and must comply with all attendant responsibilities and regulatory requirements."
 

 Wasco filed notice of appeal to this Court on 20 November 2015.
 

 II.
 
 Discussion
 

 The issue on appeal is whether the trial court erred in entering summary judgment in favor of the Section on the basis that, "[a]s a matter of law, WASCO is an operator of a landfill for purposes of the State Hazardous Waste Program's post-closure permitting requirement." WASCO contends that it is not, and has never been, an operator of any facility at the Site.
 

 Under the Administrative Procedure Act, when a party to a review proceeding in a superior court appeals to the appellate division from the final judgment of the superior court, "[t]he scope of review to be applied by [this Court] ... is the same as it is for other civil cases." N.C. Gen. Stat. § 150B-52 (2015). "Our standard of review of an appeal from summary judgment is
 
 de novo
 
 ; such judgment is appropriate only when the record shows that 'there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' "
 
 In re Will of Jones
 
 ,
 
 362 N.C. 569
 
 , 573,
 
 669 S.E.2d 572
 
 , 576 (2008) (quoting
 
 Forbis v. Neal
 
 ,
 
 361 N.C. 519
 
 , 524,
 
 649 S.E.2d 382
 
 , 385 (2007) ).
 

 Citing
 
 In re Appeal of N.C. Sav. & Loan League
 
 ,
 
 302 N.C. 458
 
 ,
 
 276 S.E.2d 404
 
 (1981), WASCO asserts that in our de novo review, the Section's interpretation of the law is entitled to no deference. However, this Court has stated that "an agency's interpretation of its own regulations will be enforced unless clearly erroneous or inconsistent with the regulation's plain language."
 

 *228
 

 Hilliard v. N.C. Dep't of Corr.
 
 ,
 
 173 N.C.App. 594
 
 , 598,
 
 620 S.E.2d 14
 
 , 17 (2005). In fact, in
 
 N.C. Sav. & Loan League
 
 , the Court explained as follows,
 

 [w]hen the issue on appeal is whether a state agency erred in interpreting a statutory term, an appellate court may freely substitute its judgment for that of the agency and employ
 
 de novo
 
 review. Although the interpretation of a statute by an agency created to administer that statute is traditionally accorded some deference by appellate courts, those interpretations are not binding. The weight of such [an interpretation] in a particular case will
 
 *410
 
 depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.
 

 302 N.C. at 465-66
 
 ,
 
 276 S.E.2d at 410
 
 (internal citations and quotation marks omitted). Thus, the Section's interpretation is afforded some deference.
 

 "Operator" is defined in various places throughout the State Solid Waste Management Act and the State Hazardous Waste Rules. First, the general definitions in Part 1 of the State Solid Waste Management Act define "operator" to mean "any person, including the owner, who is principally engaged in, and is in charge of, the actual operation, supervision, and maintenance of a solid waste management facility and includes the person in charge of a shift or periods of operation during any part of the day." N.C. Gen. Stat. § 130A-290(a)(21) (2015). This definition applies broadly to the entire State Solid Waste Management Act, including those portions relevant to hazardous waste management. The definition's application to hazardous waste management is evident from the definition provision in the State Hazardous Waste Rules, which provides that both the definition of "operator" in N.C. Gen. Stat. § 130A-290 applies to the State Hazardous Waste Rules,
 
 see
 
 15A N.C. Admin. Code 13A.0102(a) (providing "[t]he definitions contained in [N.C. Gen. Stat. §] 130A-290 apply to this Subchapter[ ]"), and that the definition of "operator" in
 
 40 C.F.R. § 260.10
 
 , "[o]perator means the person responsible for the overall operation of a facility[,]" is incorporated by reference,
 
 see
 
 15A N.C. Admin. Code 13A.0102(b). Yet, most specific to the post-closure permit requirement at issue in this case, the State Hazardous Waste Rules concerning the hazardous waste permit program incorporate by reference Subpart A of the federal regulations providing general information about the hazardous waste permit program,
 
 see
 
 15A N.C. Admin. Code 13A.0113(a), including the definitions in
 
 40 C.F.R. § 270.2
 
 , which provides that "[o]wner or operator means the owner or operator
 
 *229
 
 of any facility or activity subject to regulation under RCRA."
 
 40 C.F.R. § 270.2
 
 (2017).
 

 In this case, the court determined WASCO was an "operator" under the two definitions specifically dealing with hazardous waste management adopted from
 
 40 C.F.R. §§ 260.10
 
 and 270.2. The court, however, noted that the result would be the same applying the definition of "operator" in N.C. Gen. Stat. § 130A-290(a)(21). In conclusion number 42, the court explained its analysis of the definitions as follows,
 

 [b]ased on the federally delegated nature of the State Hazardous Waste Program, the Section's Memorandum of Agreement with the EPA, the fact that the obligation at issue arises under a federal regulation-
 
 40 C.F.R. § 270.1
 
 (c) -and not Chapter 130A, and because both parties have identified no state case law on point and have cited to federal law, [the court] concludes it is appropriate here to look to federal case law and administrative EPA documents for guidance.
 

 The federal case law considered by the court included cases analyzing operator liability under the Comprehensive Environmental Response, Compensation, and Liability Act,
 
 42 U.S.C. §§ 9601
 
 to 9675 (CERCLA), which, similar to the State Hazardous Waste Rules, defines "operator" as "any person owning or operating such facility[.]"
 
 42 U.S.C. § 9601
 
 (20)(A) (2016). Specifically, the court looked to
 
 United States v. Bestfoods
 
 ,
 
 524 U.S. 51
 
 ,
 
 118 S.Ct. 1876
 
 ,
 
 141 L.Ed.2d 43
 
 (1998), in which the Court explained that,
 

 under CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.
 

 Id
 
 . at 66-67,
 
 118 S.Ct. 1876
 
 ,
 
 141 L.Ed.2d at 59
 
 . The court in the present case then concluded that "[c]onsistent with
 
 Bestfoods
 
 and its progeny, ... post-closure operatorship is based on an examination of the totality of the circumstances."
 

 *411
 
 On appeal, WASCO's first contention is that the court erred in basing its decision exclusively on CERCLA without considering the elements of the operator definition in N.C. Gen. Stat. § 130A-290(a)(21).
 

 *230
 
 WASCO contends that the definition in N.C. Gen. Stat. § 130A-290(a)(21) sharpened the definition of operator for purposes of the State Solid Waste Management Act and, citing
 
 R.J. Reynolds Tobacco Co. v. N.C. Dep't of Environment & Natural Resources
 
 ,
 
 148 N.C.App. 610
 
 , 616,
 
 560 S.E.2d 163
 
 , 167-68 (looking to the plain meaning of N.C. Gen. Stat. § 130A-290(35) and determining that tobacco scrap, stems, and dust did fall within the definition of "solid waste"),
 
 disc. review denied
 
 ,
 
 355 N.C. 493
 
 ,
 
 564 S.E.2d 44
 
 (2002), contends the definition in N.C. Gen. Stat. § 130A-290(a)(21) is controlling over other definitions to the extent the definitions differ. Thus, WASCO contends to be an operator, it must be "principally engaged in, and is in charge of, the actual operation, supervision, and maintenance of a solid waste management facility[.]" N.C. Gen. Stat. § 130A-290(a)(21).
 

 We are not persuaded by WASCO's arguments that the court is limited to an analysis of the definition of "operator" in N.C. Gen. Stat. § 130A-290(a)(21). Moreover, we note that it is clear the court did not look exclusively to CERCLA, but instead looked to CERCLA only for guidance on how to interpret the definitions of operator in the State Hazardous Waste Rules adopted from the federal regulations. Despite differences in the framework of RCRA and CERCLA, the definitions of "operator" in both acts are similar and CERCLA case law does provide persuasive guidance. Furthermore, and not contested by WASCO on appeal, the court also looked to EPA documents providing guidance on RCRA and concluded that those documents support the conclusion that WASCO was an operator.
 

 We hold the court was correct to look for guidance in federal law while interpreting the term "operator" in the context of the State Hazardous Waste Rules and, specifically, the hazardous waste permit program. Those portions of the State Hazardous Waste Rules deal specifically with the post-closure permit requirement at issue in the present case.
 
 See
 

 40 C.F.R. § 270.1
 
 (c) (incorporated by reference in 15A N.C. Admin. Code 13A.0113(a) ). In contrast, the terms of N.C. Gen. Stat. § 130A-290(a)(21) make clear that the definition of operator therein is for an operator of any "solid waste management facility." Although that definition is more detailed than the definitions in the State Hazardous Waste Rules, that definition was intended to apply to the management of all solid wastes, not just the control of hazardous wastes of a facility post-closure.
 

 Nevertheless, although the three definitions of "operator" applicable to the State Hazardous Waste Program differ slightly, the definitions seem to be in accord that, in general terms, an "operator" is the person
 
 *231
 
 responsible for, or in charge of, the facility subject to regulation. In the present case, that facility is the pit that was certified closed as a landfill in 1993.
 

 WASCO's next contention on appeal is that the court erred in holding that WASCO was an operator even though WASCO did not become involved with the Site until after the Site was certified closed by the Section. Citing N.C. Gen. Stat. § 130A-290(a)(2), which defines "closure" to mean "the cessation of operation of a solid waste management facility and the act of securing the facility so that it will pose no significant threat to human health or the environment[,]" WASCO asserts that it is impossible to operate a facility that has ceased operation. Thus, WASCO contends it cannot be an operator of the Site.
 

 WASCO, however, recognizes that both RCRA and the State Hazardous Waste Program impose duties on operators to provide post-closure care, but contends that those duties can only be imposed on those owning and operating the facility before the time that the facility ceases to operate. WASCO asserts that the Section has created the concept of "post-closure operator" for purposes of this case without any basis in the law. Again, we disagree with WASCO's arguments.
 

 As the Section points out, and as we noted above,
 

 [o]wners and operators of ... landfills ... must have post-closure permits, unless
 
 *412
 
 they demonstrate closure by removal or decontamination as provided under § 270.1(c)(5) and (6), or obtain an enforceable document in lieu of a post-closure permit, as provided under paragraph (c)(7) of this section.
 

 See
 

 40 C.F.R. § 270.1
 
 (c) (incorporated by reference in 15A N.C. Admin. Code 13A.0113(a) ).
 

 In this case, the pit where the underground storage tanks were located on the Site was not designated a landfill for purposes of the State Hazardous Waste Program until the time that it was closed with hazardous waste in place, after the time the facility ceased to operate.
 
 See
 

 40 C.F.R. § 265.197
 
 (b) (incorporated by reference in 15A N.C. Admin. Code 13A.0110(j) ). Thus, there were no "operators" of a landfill when the facility was in operation, as WASCO limits the term. Yet, the hazardous waste permit program clearly applies to operators of landfills and those facilities closed as landfills.
 

 Moreover, although the definition of "closure" cited by WASCO is clear that the closure of a solid waste management facility is the time it
 
 *232
 
 ceases to operate, that definition also makes clear closure includes the act of securing the facility to prevent future harm. Thus, it is not just those parties in charge of the actual operation of a solid waste management facility that are subject to the post-closure permitting requirement.
 

 Guided by the same federal law relied on by the trial court, including
 
 Bestfoods
 
 , its progeny, and EPA documents, we hold "operator," as it is defined in the State Hazardous Waste Rules, includes those parties in charge of directing post-closure activities under the State Hazardous Waste Program and RCRA.
 

 In the present case, the trial court issued detailed findings as to WASCO's involvement at the Site that demonstrate it was the operator for purposes of the post-closure permitting requirement. WASCO does not challenge the factual findings, but instead asserts arguments that those findings do not lead to the conclusion that it is an operator as that term is defined in N.C. Gen. Stat. § 130A-290(a)(2). We are not convinced by WASCO's arguments.
 

 The court's pertinent findings, which this Court has reviewed and determined to be supported by the documentary exhibits, are as follows:
 

 15. WASCO became involved with the Facility in a limited capacity following its 1998 acquisition of Culligan Water Technologies, Inc. and its affiliate, Culligan International Company ("Culligan").
 

 16. At the time WASCO acquired Culligan, Culligan had been performing post-closure operations related to the Facility.
 

 17. Between 1999 and 2004, Petitioner provided financial assurance to the Section on behalf of Culligan for post-closure care associated with the Facility, including a Trust Agreement and Irrevocable Standby Letter of Credit in 2003.
 

 18. The Culligan Group, including Culligan, was divested from WASCO in 2004 in a $610-million transaction that included WASCO's agreement to indemnify Culligan's buyer "as to certain matters associated at the Facility as they relate to specific Culligan obligations."
 

 19. Following the 2004 divestiture, Culligan represented in a letter to the Section that WASCO was "assuming responsibility" for the Facility. The letter indicated
 
 *233
 
 that copies were transmitted to John Coyne, the Director of Environmental Affairs for WASCO.
 

 20. The Section followed-up with Mr. Coyne by email, referencing Culligan's representation that WASCO "is now responsible for RCRA issues" at the Facility, and asking for WASCO to complete a new Part A permit application as the Facility's operator.
 

 21. Mr. Coyne responded that (a) he was "very familiar with this project," (b) he would "attend to the Part A application in the very near future," and (c) WASCO "intend[ed] on keeping
 
 *413
 
 the same consultants ... and doing everything else we can to maintain continuity and keep the project headed in the right direction."
 

 22. An updated Part A permit application was submitted to the Section in December 2004 naming WASCO as operator. Mr. Coyne signed the Part A permit application for WASCO "under penalty of law" as to the truth of its contents.
 

 23. Mr. Coyne signed another updated Part A "under penalty of law" in 2006, which was submitted to the Section and continued to identify WASCO as operator.
 

 24. Rodney Huerter-who had assumed the role of WASCO's Director of Environmental Affairs after Mr. Coyne-signed a third Part A permit application "under penalty of law" in 2008, which was submitted to the Section and which again identified WASCO as the Facility's operator.
 

 25. After the divestiture of Culligan, WASCO continued to provide financial assurance for the Facility under the 2003 Trust Agreement, Standby Trust Fund, and Irrevocable Standby Letter of Credit, which it amended in the Section's favor for inflation 10 times between the divestiture of Culligan and the initiation of the 2013 contested case. WASCO has communicated directly with the Section throughout this time period concerning financial requirements for the Facility.
 

 26. The language of the Trust Agreement identifies WASCO as the "Grantor," and the agreement's purpose to "establish a trust fund ... for the benefit of
 
 *234
 
 [the Department]." Specifically, the Trust Agreement recites that:
 

 ... "DENR" ... has established certain regulations applicable to the Grantor, requiring that an owner or operator of a hazardous waste management facility shall provide assurance that funds will be available when needed for closure and/or post-closure care of facility....
 

 The Trustee shall make payments from the fund as the Secretary of [the Department] ... shall direct, in writing, to provide for the payment of the cost of closure and/or post-closure care of facilities covered by this agreement....
 

 "this Trust shall be irrevocable and shall continue until terminated at the written agreement of the Grantor, the Trustee, and the Secretary ..."
 

 27. The Irrevocable Standby Letter of Credit, as amended, is subject to automatic renewal in one-year increments unless cancelled by the bank.
 

 28. The most recent amendment to the Irrevocable Standby Letter of Credit submitted prior to the filing of the contested case is in the amount of $443,769.88.
 

 29. Internal WASCO communications concerning financial assurance reference "the statutory/regulatory requirements relating to one of our environmental legacy sites in Swannanoa, NC."
 

 30. After the divestiture of Culligan, WASCO entered into a Master Consulting Services Agreement with Mineral Springs Environmental, P.C. ("Mineral Springs") for Mineral Springs to perform work at the Facility.
 

 31. A total of 51 invoices from Mineral Springs to WASCO shows that Mineral Springs or its subcontractors performed a variety of post-closure activities at the Facility or related to the Facility, between November 2004 and August 2013, which fell into the following categories:
 

 - operation and maintenance of an air sparge/soil vapor extraction groundwater remediation system, including use of a subcontractor
 
 *235
 
 for supplies such as air filters, oil filters, oil, and separators;
 

 - groundwater sampling and analysis, including use of laboratory subcontractors;
 

 *414
 
 - preparation of quarterly and semi-annual reports analyzing sampling results;
 

 - project management;
 

 - assessment of two potential sources of contamination at the Facility in addition to the former tank site-specifically, an old dump site and a French drain-including use of an excavation subcontractor and a bush hog subcontractor; and
 

 - payment of utility bills based [on] one meter labeled as "pump" and one meter labeled as "environmental cleanup."
 

 32. Mr. Coyne or Mr. Huerter personally approved payment to Mineral Springs for work in the above categories, and approved payment directly to the utility company for additional bills, totaling $235,984.43.
 

 33. In particular, Mineral Springs submitted 33 reports associated with the invoiced post-closure activities to the Section on WASCO's behalf between February 2005 and May 2013, including 16 groundwater monitoring reports that expressly identified WASCO as the "responsible party for the site."
 

 34. The Section communicated directly with WASCO, or with both WASCO and Mineral Springs, in numerous matters related to environmental compliance, including but not limited to requests for preparation of a work plan for the investigation of the former dump site and French drain, and responses to Mineral Springs's monitoring reports.
 

 35. After Mineral Springs and/or its sub-contractors performed the French drain and dump assessment but before drafting the Assessment Report, Kirk Pollard of Mineral Springs notified Mr. Huerter of preliminary findings concerning the volume and nature of drums
 
 *236
 
 discovered. Mr. Pollard identified liquid in one drum that tested at a pH of 14, which is considered hazardous based on corrosivity. Mr. Pollard expressed concern for health and safety, recommended that Mr. Huerter notify the Section, and expressed his belief that an immediate response and a more thorough evaluation could be necessary. No such concerns are reflected in the final report.
 

 36. Mr. Huerter instructed Mr. Pollard not to remove "any of the drums, containers, or anything else," and asked to conduct an "advanced review" of the dump Assessment Report before its submission to the Section. Mr. Huerter commented on Mr. Pollard's first draft, including by providing two "reviewed and revised blackline document[s]."
 

 37. Additional communications between Mr. Huerter and Mr. Pollard included (a) Mr. Pollard's requests for Mr. Huerter's guidance or authorization on matters related to the Facility, including changes to a Part A form, communications with the property owner, whether groundwater sampling should continue, and whether to advise the Section about the sale of the property; (b) Mr. Pollard's practice of updating Mr. Huerter, copying him on communications with the Section, or forwarding such communications to him; and (c) Mr. Huerter's requests for copies of utility bills to compare with Mineral Springs's invoices, and annual cost projections.
 

 (Citations and footnote omitted).
 

 It is clear that the pit at the Site that was certified closed as a landfill in 1993 is subject to post-closure regulation under the State Hazardous Waste Program and RCRA. Considering the above facts, we hold WASCO was the party responsible for and directly involved in the post-closure activities subject to regulation. Even under the definition of operator in N.C. Gen. Stat. § 130A-290(a)(21), when that definition is viewed through the lens of post-closure regulatory activities at issue in this case, since 2004, WASCO has been the party principally engaged in, or in charge of the post-closure operation, supervision, and maintenance of the Site for purposes of the hazardous waste
 
 *415
 
 permit program. WASCO's arguments to the contrary are overruled.
 
 *237
 
 III.
 
 Conclusion
 

 For the reasons stated above, we hold WASCO is an operator of a landfill for purposes of the post-closure permitting requirement at the Site. Therefore, we affirm the final order and judgment of the trial court.
 

 AFFIRMED.
 

 Judges STROUD and ZACHARY concur.