In re TNT FARMS, a Partnership, Debtor.

TRI–RIVER CHEMICAL CO., INC., a Washington corporation, d/b/a UAP Northwest, Plaintiff,

v.

TNT FARMS, a Partnership; Russell Troy Palmer, partner and individually; Trent Leon Palmer, partner and individually; Terrell Kurtis Palmer, partner and individually; Lori Alair Palmer; Janilee Duffin Palmer; Agri–Service, Inc., an Idaho corporation; Agri–Credit Acceptance Corporation; Larry Walters d/b/a Jerry's Oil Company; Ferrell W. Palmer; USA Fertilizer, Inc., Snake River Farms II, LLC, an Idaho Limited Liability Company; Beta Seed, Inc., John H. Kunz; Craig Mansfield; George Hansen; Dallas Hess, Inc., an Idaho corporation, d/b/a Bio Flora N.W.; William O. Field; United States of America, Department of the Treasury, Internal Revenue Service; and John Does I through V, Defendants.

Bankruptcy No. 98–40582.
Adversary No. 98–6134.

United States Bankruptcy Court, D. Idaho.

Oct. 27, 1998.

Daniel C. Green, Racine, Olson, Nye, Budge & Bailey, Pocatello, ID, for plaintiff.

William T. Murphy, Trial Attorney, Tax Division, U.S. Department of Justice, Washington, DC, for Internal Revenue Service.

Brett P. Allison, Jones, Chartered, Pocatello, ID, for John H. Kunz.

Jeffrey M. Wilson, Wilson & McColl, Boise, ID, for Dallas Hess, Inc.

Lowell N. Hawkes, Pocatello, ID, for William O. Field.

## MEMORANDUM OF DECISION RE OMNIBUS MOTION FOR SUMMARY JUDGMENT

JIM D. PAPPAS, Chief Judge.

### I. Background

In this adversary proceeding, Plaintiff Tri–River Chemical Company, Inc., d/b/a UAP

Northwest ("UAP") seeks to establish its priority interest in 1997 crop proceeds as opposed to the other entities that extended credit to TNT Farms ("TNT"). Creditors Dallas Hess, Inc., d/b/a Bio Flora N.W. ("Bio Flora"), Internal Revenue Service ("IRS"), John Kunz ("Kunz"), and William Field ("Field") claim priority over UAP as to some or all of the proceeds. Resolution of these issues became the responsibility of this Court when TNT placed its farming operation in a Chapter 12 proceeding. The outcome of this action will significantly impact the terms of TNT's proposed reorganization plan. By agreement of the parties, this matter is before the Court on an omnibus Motion for Summary Judgment in which all the parties whose claims are unresolved have joined. Following briefing, the issues were taken under advisement.

## II. Facts

The history and events leading up to this complicated priority dispute date far back in time. From the record, the parties do not dispute the following material facts.

UAP extended credit to TNT for chemicals and fertilizer for the 1995 farm season. On July 15, 1995, TNT executed a promissory note for $400,000 evidencing its debt to UAP, together with a security agreement providing UAP a lien on all of TNT's equipment, machinery, and crops. The promissory note was due and payable on January 30, 1996. TNT failed to pay this obligation when it became due.

On May 17, 1996, UAP agreed to extend a line of credit to TNT in the amount of $497,000 for the 1996 farm season. TNT signed another security agreement with UAP covering all of TNT's equipment, machinery, and crops. UAP filed a financing statement covering potatoes, wheat, and sugar beets on May 22, 1996. TNT's obligations under the line of credit were due on January 19, 1997. TNT failed to pay the line of credit.

On July 25, 1996, IRS recorded a notice of its tax lien for delinquent taxes in the amount of $15,656, covering assessments made in March 1995 ($11,318) and March 1996 ($10,893). The taxes are still owing.

On May 20, 22, 23 and 27, 1997, Kunz delivered loads of seed potatoes to TNT. On July 23, 1997, Kunz recorded a notice of seed lien in the amount of $45,000 with respect to the seed potatoes. Kunz's account remains unpaid.

Bio Flora agreed to give credit to TNT for the purchase of agricultural chemicals for the 1997 crops. On May 22, 1997, TNT executed a security agreement with Bio Flora covering potatoes and sugar beets, and a financing statement was filed the same day. Bio Flora extended about $216,000 in credit to TNT that year, which amounts are still outstanding.

On May 23, 1997, TNT filed for bankruptcy relief under Chapter 12 of the Bankruptcy Code.

Creditor Field provided chemicals to TNT that were used in production of the 1997 crops, at least in the amount of $18,000. Field filed a financing statement on June 12, 1997, covering wheat and sugar beets.

On July 21, 1997, TNT filed a motion with this Court seeking permission to use cash collateral in the form of the 1996 crop proceeds to operate during 1997. Notice of the motion was sent to all of TNT's creditors and after a hearing, on August 4, 1997, the Court authorized use on an interim basis by TNT of $78,000 in cash collateral. The Court ordered that as adequate protection for UAP's interest in that cash collateral, that UAP be granted a first priority lien on TNT's 1997 crops to the extent of the cash collateral used. Pursuant to the Court's interim order, TNT and UAP executed another security agreement, and a financing statement was filed by UAP on September 8, 1997, covering potatoes, wheat, and sugar beets. On September 12, 1997, the Court entered a final order for use of cash collateral, authorizing TNT to use an additional $19,055.17, for a total of $97,055.17. Again, in order to provide UAP with adequate protection, the Court granted UAP "[a] validly perfected first priority post-Petition lien and security interest in all of Debtor's 1997 sugar beets, potatoes and wheat...." Order Authorizing Use of Cash Collateral, p. 3. UAP's cash collateral was never paid back.

TNT's Chapter 12 case was dismissed on November 5, 1997, when the Court entertained motions by Deere & Company and Case Credit to dismiss the case and found that adequate cause had been shown to support dismissal under Sections 1221 and 1224 of the Bankruptcy Code. At that time, Debtors held 1997 crop proceeds amounting to $383,812. On January 7, 1998, TNT filed a second Chapter 12 petition. UAP and Debtors agreed on February 13, 1998, to pay several land rent claims from the 1997 crop proceeds, with the remainder of the crop money, roughly $278,939.22, to be held in a trust account pending the resolution of the various claims to the funds. However, TNT's bankruptcy case was once again dismissed on February 25, 1998, this time pursuant to 11 U.S.C. § 109(g).[1]

On March 2, 1998, UAP commenced an action to foreclose its various liens on TNT's assets, including the crop proceeds, in state court. Debtor's current (third) Chapter 12 case was filed on May 14, 1998. This filing stayed the state court action, and UAP commenced the present adversary proceeding on May 22, 1998.

The rights or claims of many of the original defendants to this action have been disposed of either by stipulation between the parties, or through entry of default, as follows: (1) Agri–Service, Inc., and its assignee, Agricredit Acceptance Corporation has entered a Subordination Agreement with UAP (Exhibit "S" to Plaintiff's Verified Complaint); (2) USA Fertilizer has disclaimed any interest in the crop proceeds (Exhibit "T" to Plaintiff's Verified Complaint); (3) Larry Walters d/b/a Jerry's Oil Company was dismissed from the action; (4) George Hansen executed a Subordination Agreement with UAP (Exhibit "X" to Plaintiff's Verified Complaint); (5) Snake River Farms II, L.L.C. entered into a Stipulation with UAP (Exhibit "V" to Plaintiff's Verified Com-

plaint); (6) Beta Seed, Inc., entered into a Stipulation with UAP (Exhibit "W" to Plaintiff's Verified Complaint); and (7) Default was entered against TNT Farms, Russell Troy Palmer, Trent Leon Palmer, Terrell Kurtis Palmer, Lori Adair Palmer, Janilee Duffin Palmer, Ferrell W. Palmer, Craig Mansfield, and George Hansen. This Decision disposes of the claims of the remaining parties.

### III. Arguments

A priority dispute remains as between UAP, IRS, Bio Flora, Kunz, and Field in the 1997 crop proceeds. UAP asserts a priority of interest in the crop money over all other creditors.

With respect to IRS, UAP argues that under the "first in time" priority provided in 26 U.S.C. § 6323(a), it should prevail since its liens were perfected prior to recordation of the tax lien. The IRS contends that UAP's lien was not "choate" until the 1997 crops came into existence, and as a result, the interests of UAP and IRS attached simultaneously. Under case law, IRS asserts priority for the tax lien over any competing interest that arises simultaneously in the taxpayer's after acquired property.

UAP claims priority over Bio Flora pursuant to the two cash collateral orders issued by this Court during TNT's first bankruptcy case. It also points out that since TNT was in a Chapter 12 case during the 1997 farm season, and because Bio Flora did not seek approval from this Court for its lien to secure the credit extended to TNT, that Bio Flora's rights are subordinate to those of UAP. Bio Flora disputes such and asserts that it is entitled to special priority under Idaho Code § 28–9–312(2).

UAP also asserts priority over Kunz to the extent that deliveries of seed potato occurred during the pendency of the 1997 bankruptcy case. Kunz argues that under the applicable

---

1. Section 109(g) provides:
   Notwithstanding any other provision of this section, no individual or family farmer may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if—
   (1) the case was dismissed by the court for willful failure of the debtor to abide by orders of

the court, or to appear before the court in proper prosecution of the case; or
   (2) the debtor requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by section 362 of this title.

state seed lien law, his lien relates back to the date of "delivery" of the seed, and since his deliveries to TNT began pre-petition, his lien is valid and has priority over UAP.

Finally, UAP contends that Field's lien is unenforceable since it was perfected during the pendency of the Chapter 12 proceeding without permission from the Bankruptcy Court and in violation of the Section 362(a) automatic stay. UAP further contends that the dismissal of the Chapter 12 case can not reinstate the void lien.

## IV. Discussion

After consideration of the arguments of the parties, and while the facts and law are somewhat complex, the Court has reached the following conclusions concerning the priority of the parties' interests in TNT's remaining 1997 crop proceeds.

### A. First Priority

UAP has first priority to the 1997 crop proceeds by virtue of its adequate protection liens provided in the cash collateral orders issued by this Court in connection with TNT's first bankruptcy case.

■■■ Since once it is spent, cash is "gone," under Section 363(c) of the Bankruptcy Code, a debtor may not use cash collateral without either the consent of the secured parties having an interest in the cash, or permission of the court obtained after notice and an hearing. 11 U.S.C. § 363(c)(2). In connection with authorizing a debtor to use cash collateral, the Court may order that adequate protection be provided as to the interests of the secured creditors. 11 U.S.C. § 363(e). Adequate protection of a creditor's lien in cash collateral to be used by the debtor may consist of additional or replacement liens on property of the bankruptcy estate. 11 U.S.C. § 361(2). Here, in order to allow TNT to meet the expenses associated with operating its farm during 1997, the Court, after notice to TNT's creditors and a hearing, entered two orders in the Chapter 12 bankruptcy case authorizing the use of cash collateral by TNT. In those orders, as adequate protection for its interests in the cash collateral to be used by TNT, the

Court ordered that UAP be granted a first priority lien in TNT's 1997 crops. See Plaintiff's Verified Complaint: Exhibit "J" and Exhibit "K."

■■■ UAP's lien status under the cash collateral orders is complicated in this case by the fact that the bankruptcy case in which the orders were issued was, on November 5, 1997, dismissed. Usually, dismissal of a bankruptcy case operates, to the extent possible, to reverse what has transpired during the bankruptcy proceeding. 11 U.S.C. § 349(b). In determining the effect of Section 349, the Court begins with the language of the statute, *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), which provides that:

> Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title—
>
> (1) reinstates—
>
> (A) any proceeding or custodianship superseded under section 543 of this title;
>
> (B) any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or preserved under section 510(c)(2), 522(i)(2), or 551 of this title; and
>
> (C) any lien voided under section 506(d) of this title;
>
> (2) vacates any order, judgment, or transfer ordered, under section 522(i)(1), 542, 550, or 553 of this title; and
>
> (3) revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title.

11 U.S.C. § 349(b). Section 349(b)(1) expressly references other sections of the Bankruptcy Code which are impacted by a dismissal. Sections 363 and 361 are not included among the enumerated provisions. " 'It is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.' " *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (quoting *Chicago v. Environmental Defense Fund*, 511 U.S. 328, 338, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994)).

The Court presumes that the omission of Section 363 from the language of Section 349 manifests the intent of Congress to leave orders entered under Section 363 unaffected unless otherwise provided by the Court. This position is supported by *Wytch v. Pacific Reconveyance (In re Wytch)*, 223 B.R. 190 (9th Cir. BAP 1998), a case addressing the status of an order annulling stay upon dismissal. The Panel explained:

> It is clear that [Section] 349(b) vacates orders under the sections specified in the statute and that a debtor's property rights are restored to the position in which they existed prepetition upon dismissal of a bankruptcy case. The statute does not provide, however, that the dismissal of a case vacates an order issued under [Section] 362(d). Moreover, dismissal does not necessarily "undo" the bankruptcy case where the parties have acquired rights in reliance on the case.

*Wytch* at 192.

Such a reading of Section 349 is also consistent with important policy considerations concerning the effect of dismissal. Section 364 deals with liens granted by a debtor to obtain new secured credit in a bankruptcy case, and so occupies a similar status to Section 363 liens concerning financing debtor operations. Relevant here is the Court's discussion of the continuing viability of Section 364 liens upon dismissal of a bankruptcy case found in a recent decision:

> Although 364(e) speaks only of modification on appeal, it imparts the notion that bankruptcy judges may, under appropriate circumstances, make binding commitments to give priority to new credit. This rule promotes the policy of reorganization, since if creditors fear that, after the fact, financing orders will be invalidated, lenders will be extremely hesitate to advance credit. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1355 (7th Cir.1990). It is the principle whereby bankruptcy judges may grant priority to new extensions of credit that makes it unpracticable to simply ignore a Section 364 lien upon dismissal of a case.

*Intermountain Farmers Association v. Claar*, 98.3 I.B.C.R. 67, 68. Here, as in *Claar*, as a matter of policy UAP should not bear the risk that TNT's attempt to reorganize under Chapter 12 would later fail.

Finally, Section 349(b) dictates the effect of dismissal, "[u]nless the Court, for cause, orders otherwise...." On prior occasions the Court has used this grant of discretion as a means to avoid the harsh or inequitable results occasioned by the dismissal of a bankruptcy case during which parties have relied upon their status and acquired rights. *Id.* This provision therefore also allows the Court, under these appropriate circumstances, to adjust the strict results of dismissal here.

■ While UAP's Section 363 lien was not affected by the dismissal of the original Chapter 12 proceeding, should UAP be afforded the same priority as if the bankruptcy case had never been dismissed? In *Claar*, once the Court determined the creditor had a valid lien pursuant to the Section 364 order, the Court turned to state law to resolve the lien priority. So too here, under state law, UAP has a perfected judicial lien arising from the cash collateral orders, which orders both provide:

> The post-petition security interests granted herein shall be deemed effective and automatically perfected as of the Petition date without the necessity of UAP taking any further action. UAP may, however, at its option, file continuation statements, financing statements, real estate mortgages, deeds of trust, or such other documents as may be necessary to perfect the security interest provided herein, and/or continue perfection of its liens.

Plaintiff's Verified Complaint: Exhibits "J" and "K" at p. 3. While the cash collateral orders provided that UAP's priority would be subject to the interests of certain creditors, including Bio Flora and Field, these creditors never sought necessary court approval of their liens as required by the orders. Therefore, UAP has priority over all other competing liens.

Accordingly, UAP is given priority to the extent of the cash collateral orders, $97,055.17.

**B. Second Priority**

Second priority in TNT's 1997 crop proceeds belongs to IRS. Federal law provides that a lien for unpaid and delinquent taxes arises in favor of the federal government as against all of a taxpayer's property, both real and personal. 26 U.S.C. § 6321. The lien attaches to the debtor's property at the time of the relevant tax assessment. However, in order to be enforceable against competing creditors, a notice of tax lien must be filed for record. 26 U.S.C. § 6323(a).

Here, notice of the IRS tax lien was filed on July 25, 1997, after UAP had perfected its lien securing TNT's obligations under both the 1995 promissory note and the 1996 line of credit. For this reason, UAP asserts that the tax lien does not have priority over its existing perfected security interests. However, since the property in question, the 1997 crop proceeds, is considered TNT's "after acquired property," the outcome of this dispute is controlled by the United States Supreme Court's decision in *I.R.S. v. McDermott*, 507 U.S. 447, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993).

In *McDermott*, Zions First National Bank obtained and docketed a state court judgment against the McDermotts to create a lien on all of McDermotts' real property within the county under applicable Utah law. Thereafter, the IRS filed notice of its federal tax lien. When McDermotts later acquired and then sold real property within the county, the question arose as to whether Zions or the IRS had priority to the proceeds from the sale.

The Supreme Court explained that a competing state lien is deemed "to be in existence for the 'first in time' purposes of the federal tax collection statutes only when it has been 'perfected' in the sense that 'the identity of the lienor, the property subject to the lien, and the amount of the lien are established.'" *I.R.S. v. McDermott*, 507 U.S. 447, 449, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993) (quoting *United States v. New Britain*, 347 U.S. 81, 84, 74 S.Ct. 367, 98 L.Ed. 520 (1954)). Using this analysis, the Court held that neither the Zion's or IRS lien attached, nor were they perfected, until McDermotts acquired the real property. As a result, the judgment lien and the federal tax lien attached to the real property and became perfected interests simultaneously. The Court resolved the stalemate in favor of the IRS. "[U]nder the language of [Section] 6323(a) ('shall not be valid as against any . . . judgment lien creditor until notice . . . has been filed'), the filing of notice renders the federal tax lien extant for 'first in time' priority purposes regardless of whether it has yet attached to identifiable property." *McDermott*, 507 U.S. at 453, 113 S.Ct. 1526.

The facts in this action are very similar to those in *McDermott*. UAP filed a financing statement on May 22, 1996, perfecting its secured interest in any present and future crops of TNT. IRS filed its notice of federal tax lien on July 25, 1996 for taxes assessed in 1995 and 1996. The tax lien attached to any property rights acquired by TNT after assessment. Under Idaho Code Section 28–9–203, UAP's security interest did not become enforceable until TNT acquired rights in the collateral, in this case the 1997 crops. Idaho Code § 28–9–203(1)(c). Further, "a security interest attaches when it becomes enforceable against the debtor with respect to the collateral." Idaho Code § 28–9–203(2). In this case, TNT did not have rights in the collateral until, at the earliest, its crops were planted in the spring of 1997. Regardless of the exact date, the critical point is that both liens attached on the exact same date during the 1997 crop season. Under *McDermott*, the IRS therefore has priority over the perfected interest of UAP to the extent of its filed lien, or $15,656.

**C. Third Priority**

Third priority to the 1997 crop proceeds belongs to the seed lien held by Kunz for amounts owed for potatoes delivered to TNT before and after the filing of TNT's bankruptcy petition. The Idaho seed lien statute provides in part:

(1) Any person who furnishes seed to a producer to be sown or planted on lands owned, rented or otherwise lawfully occupied by the producer, shall have a lien in the crop or crops produced from the seed for the purchase price of the seed.

(2) The seed lien shall have priority over any security interest in the same crop, but shall be subordinate to a farm laborer's lien in the same crop.

Idaho Code § 45–304(1) and (2). The lien attaches to the crop and is deemed perfected upon filing a notice of claim of lien with the secretary of state. Idaho Code § 45–307(1).

Kunz furnished seed potatoes to TNT Farms which were used in production of the 1997 crop. The shipments occurred both before and after the filing of the Chapter 12 proceeding. Kunz filed a notice of seed lien on July 23, 1997, within the 90 period prescribed by Idaho Code Section 45–308, to perfect his seed lien. However, between the first shipment of seed potatoes and the filing of the notice of lien, TNT Farms filed for Chapter 12 bankruptcy relief.

Kunz argues that delivery of the seed potatoes should be viewed as a single event, which occurred pre-petition when the first shipment arrived at TNT Farms. Kunz has advanced no authority to support this argument and relies solely on the Affidavit of Tom Sahlberg, see Kunz's Memorandum in Support of Lien Priority: Exhibit "E." However, Mr. Sahlberg's Affidavit does not support Kunz's argument, but rather *contradicts* it. Sahlberg states that, based on his experience and observations in the seed industry over the last several decades, delivery of seed is one event that begins with the first shipment and ends when the last shipment is received by the buyer. Further, Sahlberg asserts that delivery does not occur on a load by load basis. Under this approach, delivery would not be complete until the final shipment, or in this case, until May 27, 1997, which was after the bankruptcy petition had been filed. Adoption of Mr. Sahlberg's definition of delivery places the facts of this case

squarely within the authority of *In re Fielding,* 89 I.B.C.R. 31.

In *Fielding,* Creditor Calonge furnished seed potatoes to Debtor Fielding after the commencement of Fielding's bankruptcy case. Calonge then perfected his lien by recording a notice. Ordinarily, the automatic stay prohibits any acts to perfect a lien in a debtor's property after a bankruptcy petition is filed without permission from the Bankruptcy Court. 11 U.S.C. § 362(a)(4). Under case law, actions taken in violation of the automatic stay are considered void. *Schwartz v. United States (In re Schwartz),* 954 F.2d 569 (9th Cir.1992). However, Calonge argued that his actions were authorized under Sections 362(b)(3) [2] and 546(b) [3] of the Bankruptcy Code, and therefore his lien was valid.

Disagreeing with Calonge, the Court explained that post-petition perfection of a lien under Section 546 is authorized solely with respect to liens arising before the bankruptcy is filed. Since Calonge's delivery of the seed potatoes occurred after bankruptcy, Calonge's lien did not arise pre-petition. Instead, Calonge's perfection of the post-petition lien was a violation of the automatic stay and was considered to be null and void *ab initio.* 89 I.B.C.R. at 37.

The Court can not agree with Kunz's "single delivery theory" under the facts and circumstances of this case. Here, from the record, it clearly appears that the seed potatoes were shipped in separate loads, which shipments occurred both before and after the bankruptcy filing. Recognizing this preserves the commercial reality of the transaction, and actually serves to benefit the seed vendor by giving it the full time allowed by the statute to record a seed lien. However, such an approach requires that the Court

---

**2.** Section 362(b) provides in part:

The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—

(3) under subsection (a) of this section, of any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title. . . .

**3.** Section 546(b)(1) provides in part:

The rights and powers of a trustee under sections 544, 545, and 549 of this title are subject to any generally applicable law that—

(A) permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection. . . .

apply a separate set of bankruptcy law rules to pre-petition shipments as opposed to those which occurred post-petition.

■ As to the pre-petition shipments, Kunz has a valid perfected seed lien in the 1997 crop proceeds. Although Kunz perfected the lien post-petition, "[i]n bankruptcy, after the petition is filed, a statutory lien claimant who has failed to perfect its pre-petition lien takes priority over the trustee [and others] if the lien is later properly and timely filed." *In re Fielding,* 89 I.B.C.R. 31, 36. This rule is embodied in the operation of Sections 362(b)(3) and 546(b) of the Bankruptcy Code. Section 546 protects the unperfected statutory lien claimant against the hypothetical lien creditor status the bankruptcy trustee gains at the commencement of a bankruptcy case by allowing the claimant an opportunity to perfect its interest post-petition, so long as such perfection is still within the statutory time periods for perfection. Section 362(b)(3) provides an exception to the automatic stay for parties holding statutory liens that can not be avoided under Section 546. For this reason, Kunz has a valid, priority seed lien only as to the shipments occurring before TNT filed for bankruptcy. Based upon the record, the Court calculates this sum to be $18,567.38.[4]

■ Next, the Code does not protect a creditor who attempts to perfect a lien which arises after the commencement of the bankruptcy proceeding. As to the post-bankruptcy shipments, UAP asserts that the act of perfecting the seed lien post-petition is a violation of the automatic stay, rendering the act of perfection void and stripping Kunz of any perfected seed lien relating to post-petition shipments.

Within the original Chapter 12 proceeding, UAP's argument would be persuasive, since Kunz would have held an unenforceable lien to the extent of the post-petition deliveries. As mentioned above, upon dismissal of bankruptcy case, Section 349 operates to reinstate certain rights affected by the bankruptcy proceeding. Here, though, Kunz's status was never attacked in the bankruptcy pro-

ceeding, leaving it untouched at dismissal. Section 349 is simply not applicable to unaffected rights since there is nothing to reinstate. Therefore, Kunz would have the same rights as to the post-petition seed shipments as if the bankruptcy case had never been filed, except for the priority afforded the cash collateral orders of UAP. In other words, UAP can not use the dismissed bankruptcy proceeding to jump ahead of Kunz under state law priority under the circumstances of this case.

Therefore, Kunz also has seed lien priority of $26,386.62 as to the post-petition shipments of seed potatoes, for a total seed lien of $44,954.

### E. Fourth Priority

The fourth priority position belongs to UAP under its line of credit agreement with TNT under the first in time priority system of Idaho Code § 28–9–312 which provides in part:

(5) In all cases not governed by other rules stated in this section ... priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) conflicting security interests rank according to priority in time of filing or perfection....

Idaho Code § 28–9–312(5).

■ In this case, UAP's security interest, securing obligations of the promissory note, was perfected on July 15, 1995, and the security interest relating to the line of credit was perfected on May 22, 1996. Bio Flora perfected its security interest in TNT's sugar beet and potato crops on May 22, 1997. Field did not have a perfected security interest until at the earliest June 12, 1997, assuming Field had a valid interest at all. Thus, under the first in time rules, UAP clearly has priority over Bio Flora and Field.

However, Bio Flora asserts priority under Idaho Code § 28–9–312(2), in effect trumping the first in time priority of UAP. In order to

---

4. Kunz shipped 255,550 net pounds of seed potatoes at a total cost of $44,954. This amounts to approximately $.17591078 per net pound. Pre-

petition shipments totaled 105,550 net pounds (55,740 on May 20 and 49,810 on May 22) for a total cost of $18,567.38.

qualify for such special priority, the interest must be:

A perfected security interest in crops for new value given to enable the debtor to produce the crops during the production season and given not more than three (3) months before the crops become growing crops by planting or otherwise takes priority over an earlier perfected security interest to the extent that such earlier interest secures obligations due more than six (6) months before the crops become growing crops by planting or otherwise, even though the person giving new value had knowledge of the earlier security interest.

Idaho Code § 28-9-312(2). Under this provision, it is the date that TNT's obligations to UAP became due that will control whether Bio Flora is afforded a higher priority.

The amounts owed by TNT to UAP represented by the promissory note were due and payable on January 30, 1996, well over a year prior to the 1997 crops being planted or beginning to grow. In addition, Bio Flora provided chemicals that were necessary for the production of the 1997 crops. Therefore, Bio Flora has priority over UAP's earlier perfected security interest under Idaho Code § 28-9-312(2) as to amounts owed UAP under the note.

However, TNT's obligations under the line of credit agreement with UAP were due and payable on January 19, 1997. Six months after that date would have been approximately July 19, 1997. The record, provided by Bio Flora, shows that TNT planted its sugar beet crop on May 15, 1997, and the potato crop on June 10, 1997. Since the obligations under UAP's security interest on the line of credit first became due no more than six months prior to TNT planting its crops, Bio Flora does is not protected by the priority provisions of Idaho Code § 28-9-312(2).

In sum, UAP takes priority over Bio Flora and Field with respect to its security interest arising from the line of credit. Bio Flora then takes priority over Field and UAP's security interest relating to the promissory note. Finally, under the first in time rule, UAP has priority over Field with respect to the security interests related to the promissory note.

Finally, Bio Flora asks this Court consider intervening on its behalf as against UAP under an equitable marshaling theory. *See In re Kerbs,* 207 B.R. 211, 215 (Bankr. D.Mont.1997); *In re Medina,* 205 B.R. 216, 223 (9th Cir. BAP 1996). While it is true that UAP holds liens potentially securing its claims against TNT's other assets, it is by no means apparent at this point that UAP's debt can be satisfied out of that collateral. Moreover, the Court in disinclined to intervene on an equitable basis where there is a comprehensive statutory system in place dictating priority of the parties' interests. Where the legislature has considered the relative rights of the parties and declared as a matter of policy what the outcome of a priority contest should be, the Court should be, and here is, reluctant to adjust the results solely in the name of equity.

## V. Conclusion

Because no genuine issues of material fact remain, summary judgment will be granted as to priority of interests in TNT's 1997 crop proceeds in the following order: (1) UAP, pursuant to the cash collateral orders, for $97,055.17; (2) IRS for delinquent 1995 and 1996 taxes for $15,656; (3) the Kunz seed lien for all pre-petition deliveries of seed potatoes for $18,567.38 and for post-petition deliveries of $26,386.62; (4) UAP, for the balance of amounts owing under the 1996 line of credit agreement with TNT, for approximately $556,000; (5) Bio Flora, for 1997 credit, for $216,285; (6) UAP for amounts owing under the promissory note, for approximately $77,000; and finally (7) Field as to $18,000. In addition, the parties are each entitled to recover interest and other charges as part of their respective claims secured by the crop proceeds to the extent authorized by 11 U.S.C. § 506(b).

Counsel for Plaintiff may, after review by other counsel, submit an appropriate form of judgment for entry by the Court.