### HAMBLEN COUNTY EDUCATION ASSOCIATION, Plaintiff– Appellant,

v.

### The HAMBLEN COUNTY BOARD OF EDUCATION, Defendant–Appellee,

and

### Wendell Francis, et al., Intervenors– Appellees.

Court of Appeals of Tennessee, Eastern Section.

Oct. 14, 1994.

Application for Permission to Appeal Denied by Supreme Court Jan. 30, 1995.

Charles Hampton White, Kurtis J. Winstead, Cornelius & Collins, Nashville, for plaintiff-appellant.

H. Scott Reams, Taylor, Reams, Tilson & Harrison, Morristown, for defendant-appellee.

C. Dwaine Evans, Morristown, for intervenors-appellees.

1. Also involved in the dispute are 16 teachers in the Hamblen County School System who were allowed to intervene below. They support the Board's position in this litigation.

2. "The board of education and the recognized professional employees' organization shall negotiate in good faith the following conditions of employment:
(1) Salaries or wages;
(2) Grievance procedures;

## OPINION

SUSANO, Judge.

This case involves a dispute between [1] The Hamblen County Board of Education (Board), and the Hamblen County Education Association (Association), the latter being the duly recognized exclusive representative of all of the Board's professional employees pursuant to the provisions of T.C.A. § 49–5–601, *et seq.*, the Education Professional Negotiations Act (EPNA). At issue is whether an early retirement incentive program unilaterally adopted and implemented by the Board is a mandatory subject of negotiations under the provisions of T.C.A. § 49–5–611(a) [2]; and whether the Board violated the EPNA when it unilaterally adopted and implemented such a program during the course of negotiations between the Board and the Association regarding a new labor agreement. The Chancellor, sitting without a jury, found that the early retirement incentive program adopted by the Board was not a mandatory subject of negotiations under T.C.A. § 49–5–611(a), and thus concluded that the Board's unilateral action in adopting the program was "a valid and binding enactment." This appeal followed. We are asked to review the Chancellor's determinations.

### I

In 1978, the General Assembly enacted the EPNA. Chapter No. 570, Public Acts of 1978. The caption sets forth the thrust of the Act:

... to provide for a framework of school board-professional employee negotiations by establishing uniform and orderly methods for recognition and negotiating between professional employee organizations and boards of education; establishing unlawful acts; and remedies for violation of the act.

(3) Insurance;
(4) Fringe benefits, but not to include pensions or retirement programs of the Tennessee consolidated retirement system;
(5) Working conditions;
(6) Leave;
(7) Student discipline procedures; and
(8) Payroll deductions." T.C.A. § 49–5–611(a).

Since its enactment, the EPNA has been amended [3] twice, but neither amendment is relevant to the issues before us. There are few reported appellate decisions construing the EPNA, and none which address the main subject of this litigation.

The Association is the exclusive representative of the Board's professional employees pursuant to the provisions of T.C.A. § 49-5-606.[4] In early 1992, the Board and the Association were involved in negotiations regarding a new labor contract. During these negotiations, the Board presented [5] an early retirement incentive program to the Association's negotiators. The Board subsequently withdrew its incentive proposal. Negotiations continued during the remainder of 1992. In December, 1992, the Association asked for a mediator in accordance with T.C.A. § 49-5-613.[6]

On March 8, 1993, while negotiations and mediation were ongoing, the Board, at its regular meeting and over the objection of the Association, adopted a "Voluntary Professional Retirement Incentive Program" (Program) which closely resembles the early retirement incentive program the Board had offered to the Association. The Program is an offer of a cash incentive to the current employees of the Board to induce them to retire. The only employees eligible for the Program are those "currently actively employed by the school system." In order to be eligible, an employee must have ten years of service in the Hamblen County School System and must either be age 55 or older by August 15 or have thirty or more years of experience credited as service under the Tennessee Consolidated Retirement System (TCRS). A teacher who wishes to accept the inducement to retire must notify the superintendent's office of that election by May 1 of the year in which that teacher expects to retire. Under the terms of the Program, such an employee will receive three cash payments of $3,000 each, paid in successive years, for a total cash inducement of $9,000 in exchange for the employee's decision to retire early. These payments are in addition to retirement benefits due under the TCRS. The Board may, at its discretion, discontinue or review the Program by the end of any year.

The Program was adopted by the Board pursuant to the authority granted in T.C.A. § 49-2-203(b)(9):

> The local board of education shall have the power to:
>
> \* \* \* \* \* \*
>
> (9) Offer and pay a bonus or other monetary incentive to encourage the retirement of any teacher or other employee who is eligible to retire. For purposes of this subdivision, "local board of education" means the board of education of any county, municipal or special school system.

The authority [7] for such a program was incorporated into the powers and duties of local boards of education by Chapter 367 of the Public Acts of 1983.

---

3. *See* Chapter No. 308, Public Act of 1987; Chapter 183, Public Acts of 1983.

4. "A professional employees' organization recognized pursuant to this part shall be the exclusive representative of all the professional employees employed by that board of education for the purpose of negotiating. A challenge to recognition may be made only by the board of education or another professional employees' organization as provided in § 49-5-605." T.C.A. § 49-5-606.

5. The fact that the Board presented the program to the Association during negotiations does not necessarily indicate that the Board thought the matter was a subject which had to be negotiated under T.C.A. § 49-5-611(a). Subsection (b) of that statute recognizes that the parties are free to discuss "other [non-mandatory] terms and conditions of employment in service."

6. T.C.A. § 49-5-613 provides, in pertinent part, as follows:

> Following reasonable efforts to reach agreement, either the board of education or the recognized professional employees' organization may, upon written notification to the other, request the services of the federal mediation and conciliation service.

7. The Board argues that the failure of the General Assembly to specify that its grant of authority is subject to T.C.A. § 49-5-611(a) indicates that this authority is not subject to that code provision. We disagree. We believe that if the General Assembly had intended the interpretation suggested by the Board, it would have expressly so provided.

The Association responded to the Board's unilateral action by filing a Complaint and application for temporary injunction in the trial court requesting declaratory and injunctive relief under the EPNA. The Association alleged that the Board's action was a failure to negotiate on a mandatory subject of negotiations and that such failure was an unlawful act under the EPNA. The trial court denied the Association's application for a temporary injunction. This matter was subsequently heard on its merits with the result indicated earlier in this Opinion.

## II

 Our review of this non-jury case is *de novo* upon the record of the trial court, accompanied by a presumption that the trial court's findings are correct, unless the evidence preponderates against those findings. Tenn.R.App.P. 13(d). No presumption attaches to the trial court's conclusions of law. *Rainey v. Stansell*, 836 S.W.2d 117, 118 (Tenn.App.1992). Where, as here, the operative facts are not in dispute, the issue before us becomes a question of law for our determination. *Tennessee Farmers Mut. v. American Mut.*, 840 S.W.2d 933, 936 (Tenn. App.1992). In a *de novo* review, the parties are entitled to a re-examination of the whole matter of law and fact and this Court is required to render the judgment warranted by the law and evidence. Tenn.R.App.P. 36; *Thornburg v. Chase*, 606 S.W.2d 672, 675 (Tenn.App.1980); *American Buildings Co. v. White*, 640 S.W.2d 569, 576 (Tenn.App.1982).

Our first task in this review is to determine whether the Program adopted by the Board is a subject of mandatory negotiations under T.C.A. § 49–5–611(a). The following matters are subjects which must be negotiated by the parties in good faith:

> *Salaries or wages;*
>
> Grievance procedures;
>
> Insurance;
>
> *Fringe benefits, but not to include pensions or retirement programs of the Tennessee Consolidated Retirement System;*
>
> Working conditions;
>
> Leave;

> Student discipline procedures;
>
> Payroll deductions. (Emphasis added)

The Association argues that the Board's Program is a subject of mandatory negotiations because it is "salaries or wages" or "fringe benefits." The Board takes the position that the Program does not fall within either category, and argues that the legislative history of the EPNA demonstrates that a program such as the one at issue in this case is not included within the listed subjects of mandatory negotiations.

In the case of *Carson Creek Vacation Resorts v. Dept. of Revenue*, 865 S.W.2d 1 (Tenn.1993), the Supreme Court set forth the most familiar of the many rules of statutory construction:

> The most basic rule of statutory construction is to ascertain and give effect to the intention and purpose of the legislature. *Worroll v. Kroger Co.*, 545 S.W.2d 736 (Tenn.1977). Legislative intent or purpose is to be ascertained primarily from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language. *National Gas Distributors, Inc. v. State*, 804 S.W.2d 66 (Tenn.1991). Where the language contained within the four corners of a statute is plain, clear, and unambiguous and the enactment is within legislative competency, "the duty of the courts is simple and obvious, namely, to say *sic lex scripta*, and obey it." *Miller v. Childress*, 21 Tenn. (2 Hum.) 319 [320] 321–22 (1841).

*Id.* at 2. The same subject was addressed in *Austin v. Memphis Pub. Co.*, 655 S.W.2d 146 (Tenn.1983):

> The determination of the issue before us is controlled by the most basic and fundamental rule of statutory construction. It has been expressed in many ways over the years but has always conveyed the principle that *the courts are restricted to the natural and ordinary meaning of the language used by the Legislature within the four corners of the statute, unless an ambiguity requires resort elsewhere to ascertain legislative intent.* (Emphasis Added).

*Id.* at 148. *See also Dunn v. Hackett,* 833 S.W.2d 78, 81 (Tenn.App.1992); *Laymance v. Vaughn,* 857 S.W.2d 36, 37 (Tenn.App.1992); *West American Insurance Co. v. Montgomery,* 861 S.W.2d 230, 231 (Tenn.1993).

If a statute is unambiguous, legislative intent is to be determined from the face of the statute. *Carson Creek Vacation Resorts,* 865 S.W.2d at 2; *James Cable Partners v. Jamestown,* 818 S.W.2d 338, 341 (Tenn.App.1991) ("... when a statute is unambiguous legislative intent can be ascertained from the face of the statute.") It is not for the courts to question the wisdom of a legislative enactment. We "must take statutes as [we] find them." *Tennessee Mfr'd Housing v. Metro. Govt.,* 798 S.W.2d 254, 257 (Tenn.App.1990).

We believe that the language of T.C.A. § 49–5–611(a) is "plain, clear, and unambiguous." *See Carson Creek Vacation Resorts v. Dept. of Revenue,* 865 S.W.2d at 2. We do not agree with the Appellant's contention that we should resort to the federal National Labor Relations Act (NLRA) [8] for guidance. On the contrary, we believe that the words "salaries" and "wages" as those words are ordinarily used both have well-defined meanings. We agree with the Supreme Court of Iowa in the case of *Ft. Dodge Com. Sch. v. Pub. Employ. Rel. Bd.,* 319 N.W.2d 181, (Iowa 1982):

> We have said wages under the statute means "a specific sum or price paid by an employer in return for services rendered by an employee" [citation omitted]; and, adopting a dictionary definition, we have said that it also means "pay, given for labor, usually manual or mechanical, at short stated intervals, as distinguished from salaries or fees, [and denotes] the price paid for labor, especially by the day or week." [citation omitted].
>
> We are convinced the legislature did not intend to give "wages" the broad application contended for here. If it had intended to include all "wage-related" remunerations of all species within the term "wages," it would have been unnecessary to include in the list of mandatory subjects so many wage-related items such as insurance, vacations, overtime compensation, and supplemental pay. [citations omitted]. *In its commonly understood meaning wages would not include payment for services not rendered or labor not performed.* (Emphasis Added)

*Id.* at 183. In *Ft. Dodge,* the Supreme Court of Iowa went on to hold that a plan providing for a cash incentive for early retirement for teachers sixty years of age or older was neither "wages" nor "supplemental pay" as those terms are found in Iowa's statute specifying mandatory subjects of negotiations. Our analysis of the cash incentive in the instant case compels us to reach the same result as that reached by the *Ft. Dodge* court. The incentive at issue in this case is a payment made to induce teachers to retire—in other words, to cease working. As the *Ft. Dodge* case points out, terms such as "salaries" and "wages" are commonly understood to mean direct compensation for work and services currently rendered. To interpret the terms "salaries or wages" to include the payments at issue in this case—not being for work and services currently rendered—is to place a strained construction on these words. This we cannot do. *Carson Creek Vacation Resorts v. Dept. of Revenue,* 865 S.W.2d at 2. We reject the Appellant's contention that the Board's Program provides for "salaries and wages."

The issue of whether the incentive payment is a fringe benefit under T.C.A. § 49–5–611(a) presents an entirely different question. We agree with the Association that the payments encompassed in the Board's Program are "fringe benefits" as that concept is set forth in T.C.A. § 49–5–611(a). "Fringe benefits" is a broad concept. It is one which we all encountered when we first entered the labor market. It is commonly understood in this country to mean

---

8. The parties recognize that the NLRA is not authoritative since it does not apply to states or their political subdivisions; but the Appellant argues that cases under the NLRA are instructive, if not persuasive. Because we believe that T.C.A. § 49–5–611(a) can be interpreted using principles of statutory construction well-established in this state, we see no need to explore precedent under the NLRA.

benefits [9] which accrue to an employee by reason of his employment other than the employee's salary or wages. The word "fringe" in this context is to differentiate these benefits from the "direct" benefit of one's salary or wages.

Lexicographers appear to be of one mind in defining the concept of "fringe benefits." The term has been defined as the "[s]ide benefits that accompany or are in addition to a person's regular compensation (e.g., paid insurance, paid holidays and vacations)." William Statsky, *West's Legal Thesaurus/Dictionary*, 340 (1986). Another dictionary has defined a "fringe benefit" as "[a]n employment benefit given in addition to one's wage or salary." *The American Heritage Dictionary of the English Language* (William Morris, Editor, 1978).

Recognized legal dictionaries are in accord. In *Ballentine's Law Dictionary* at 503 (3rd ed. 1969), the term is defined as "[b]enefits received by any employee in addition to wages or salary, such as group insurance, pension rights, etc." The most authoritative of the legal dictionaries gives a more detailed, but substantially similar, definition of "fringe benefits":

> Side, non-wage benefits which accompany or are in addition to a person's employment such as paid insurance, recreational facilities, sick leave, profit-sharing plans, paid holidays and vacations, etc. Such benefits are in addition to regular salary or wages and are a matter of bargaining in union contracts.

*Black's Law Dictionary*, 667–68 (Sixth Edition 1990).

In *NL Industries, Inc. v. Dill*, 769 P.2d 920 (Wyo.1989), the Supreme Court of Wyoming was called upon to define "fringe benefits" in a Wyoming statute. In holding that a relocation cost reimbursement fell within the statutory language "fringe benefits," the court defined the concept as follows:

> ... fringe benefits are the ancillary considerations of a material nature which include

medical insurance, retirement programs, stock purchase plans, annual and sick leave, good lighting, coffee hours, and all other similar results of employment which serve the personal interests of the employer and may further include cars, housing, expense accounts and use of credit cards. See *Panhandle Eastern Pipe Line Co. v. Smith*, 637 P.2d 1020, 1025 (Wyo.1981), including as "tangible fringe benefits" the following: "a stock purchase plan, health insurance, investment credit matching stock ownership plan, group life insurance, and a qualified retirement pension plan ..."

*Id.* at 925.

The parties in their briefs debate whether the Board's Program is a retirement plan. We agree with the Appellee that it is not.[10] The Program provides for incentive payments to *induce* a person to retire. It does not provide for retirement benefits in the traditional sense, i.e., a periodic—usually monthly—payment after cessation of employment to take the place of one's salary or wages; but we believe that it is immaterial whether the Program is a retirement plan or not. The issue is not whether the Program is a "retirement plan" but whether it is a fringe benefit. We believe it is, given the "plain, clear, and unambiguous" meaning of the words used by the General Assembly. An employee of the Hamblen County School System would certainly consider the Board's Program a "benefit" as that term is traditionally defined. See Footnote 9. The intervenors in this case apparently view it as a "benefit" because they seek to sustain the Board's Program rather than see it returned to the negotiating table for further discussion. The Program certainly cannot be viewed as a "detriment" to employment with the Hamblen County School System. An employee who is otherwise eligible for retirement can pick up an additional $9,000 just by deciding that he or she will retire early and no longer teach. Whether one avails himself or herself of this "perk," it is certainly there

---

9. A "benefit" is defined as "[a]nything that promotes or enhances well-being; advantage." *The American Heritage Dictionary of the English Language* (William Morris ed. 1978).

10. Our finding is consistent with T.C.A. § 8–35–318(a), which provides that "[a]ny other provision of the law to the contrary notwithstanding, a local board of education shall not be entitled to establish a local teacher retirement fund."

as a potential benefit. To argue otherwise is to ignore the clear meaning of the term "fringe benefits."

The method of statutory construction utilized to interpret statutes setting forth subjects of mandatory negotiations between school officials and professional employees is not uniform in this country. For example, in Michigan, the statute is construed liberally. *W. Ottawa Ed. Ass'n v. W. Ottawa Pub. Schools,* 126 Mich.App. 306, 337 N.W.2d 533, 539 (1983):

> ... Michigan courts have adopted a more liberal approach in determining whether a particular subject may be classified as a mandatory subject of bargaining, since public employees are forbidden to strike ...;

In Iowa, on the other hand, a narrow interpretation is utilized. *Ft. Dodge,* at 183. ("... it is to be narrowly applied."). It is not necessary in the instant case to align ourselves with either approach. This is true because the approach of ascertaining legislative intent "from the natural and ordinary meaning of the language used" is all that is required in this case.

The Board urges us to examine the legislative history of the EPNA. They contend that this history demonstrates that the Board's Program is not a subject of mandatory negotiations. We decline the Appellee's invitation to explore the legislative history of EPNA. While an ambiguous statute generally requires a review of available legislative history, we resist the temptation to visit the morass which is the 113 pages of transcript of legislative debate on the initial enactment of the EPNA, filled as it is with what are arguably partisan statements on both sides of the debate. Since we think the meaning of the concept of "fringe benefits" is clear given the ordinary meaning of the term, we are precluded from resorting to the legislative history. It is only when the meaning of a legislative enactment is ambiguous that we are justified in looking at the legislative history in order to ascertain legislative intent:

> Where there is no ambiguity in the language of an act, comments of legislators, or even sponsors of the legislation, before its passage are not effective to change the clear meaning of the language of the act.

*D. Canale & Co. v. Celauro,* 765 S.W.2d 736, 738 (Tenn.1989). *See also Elliott Crane Serv. v. H.G. Hill Stores,* 840 S.W.2d 376, 379 (Tenn.App.1992) ("Where the legislative intent has been clearly stated in a legislative act, that intent cannot be limited or modified by any oral expression during debate."); *Holder v. Hall,* —— U.S. ——, ——, 114 S.Ct. 2581, 2612, 129 L.Ed.2d 687 (1994) (Thomas, J., concurring in judgment) (" 'We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.' ") quoting from *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992); *Chicago, Ill. v. Environmental Defense Fund,* —— U.S. ——, ——, 114 S.Ct. 1588, 1593, 128 L.Ed.2d 302 (1994) (Scalia, J.) ("... it is the statute, and not the Committee Report, which is the authoritative expression of the law, ..."); *U.S. v. Wilson,* 916 F.2d 1115, 1117 (6th Cir.1990); *In Re Lucas,* 924 F.2d 597, 600 (6th Cir.1991).

We find and hold that the Board's early retirement incentive program is a fringe benefit under T.C.A. § 49–5–611(a) and hence a mandatory subject of negotiations under that statute. Having so found, we vacate the Judgment of the trial court finding and holding to the contrary. We further hold and find that the adoption and implementation by the Board of the early retirement incentive program is an unlawful act in violation of T.C.A. § 49–5–609, and the Board is hereby enjoined from implementing the program it adopted March 8, 1993. This matter is remanded to the trial court for such further proceedings as may be necessary consistent with this Opinion. Costs are taxed to the Board.

FRANKS and McMURRAY, JJ., concur.