In re PREMIER HOTEL DEVELOP-
MENT GROUP d/b/a Hospitality Con-
sultants, The Carnegie Hotel, Austin
Spring Spa & Salon, and Luigies;
Premier Investment Group d/b/a Pre-
mier Investments; and Samuel T. Eas-
ley, Debtors.

CainRash Architectural Group,
Inc., Plaintiff,

v.

Premier Hotel Development Group, a
Tennessee general partnership; the
Public Building Authority of Johnson
City; First Tennessee Bank National
Association; K. Newton Raff, Trustee;
and Samuel T. Easley, Defendants.

Bankruptcy Nos. 01–20923,
01–20940, 01–20922.
Adversary No. 01–2023.

United States Bankruptcy Court,
E.D. Tennessee.

Jan. 17, 2002.

O. Taylor Pickard, Jr., Wilson, Worley & Gamble, P.C., Kingsport, TN, for Cain-Rash Architectural Group, Inc.

P. Edward Pratt, Suzanne H. Bauknight, Baker, Donelson, Bearman & Caldwell, Knoxville, TN, for First Tennessee Bank National Association and K. Newton Raff, Trustee.

### MEMORANDUM

MARCIA PHILLIPS PARSONS,
Bankruptcy Judge.

In this adversary proceeding, the plaintiff, CainRash Architectural Group, Inc. ("CainRash"), seeks to enforce its architectural lien against property of the estate and a determination that its lien is superior to the mortgage held by First Tennessee Bank National Association ("First Tennessee"). Presently before the court is First Tennessee's motion to dismiss pursuant to Fed. R. Bankr.P. 7012(b). At issue is the construction of TENN. CODE ANN. § 66–11–102(c), the statute which grants an architect a lien for architectural services. The question presented is which lien has priority under this statute: an earlier in time unrecorded lien of an architect or a subsequently recorded mortgage whose holder was not provided written notice of the architectural lien? Because the court concludes the latter, First Tennessee's motion to dismiss will be granted.[1] This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(K).

I.

Based on the representations of the parties as set forth in their respective memoranda of law, it appears undisputed that by contract dated January 20, 1999, CainRash agreed to provide architectural services for the construction of what came to be known as the Carnegie Hotel in Washington County, Tennessee owned by the debtor, Premier Hotel Development Group ("Premier"). On March 23, 2000, some fourteen months after the architectural services contract was executed, a deed of trust securing a debt owed by Premier in the amount of $8.25 million in favor of First Tennessee was recorded in the register's office for Washington County, Tennessee.

Thereafter, on March 14, 2001, Cain-Rash filed suit in the Chancery Court for Washington County, Tennessee against Premier, First Tennessee, and others as-

---

1. First Tennessee also asserts as a basis for dismissal that CainRash failed to perfect its lien through issuance of a proper attachment because the attachment bond was not for an amount twice the amount owed to CainRash as required by TENN. CODE ANN. § 29–6–117(c). Because the court concludes that CainRash's lien is inferior to First Tennessee's mortgage under TENN. CODE ANN. § 66–11–102(c), it is not necessary to address the attachment issue.

serting an interest in the Carnegie Hotel. CainRash alleged in the complaint initiating that action that it was owed the sum of $298,937 for architectural services performed by it and requested a judgment against Premier in this amount. CainRash also alleged that it held a lien against the Carnegie Hotel to secure payment of the amount owed to it. In order to enforce this lien, CainRash requested that an attachment issue and be levied on the Carnegie Hotel, that the hotel be sold in satisfaction of the requested judgment, and that its lien be declared superior to the deed of trust, i.e., mortgage, held by First Tennessee. Shortly after CainRash filed its complaint, Premier filed for chapter 11 relief on March 15, 2001, commencing the underlying bankruptcy case. Then on April 19, 2001, Premier removed CainRash's state court action to this court, initiating the present adversary proceeding.

In its motion to dismiss, First Tennessee asserts that TENN. CODE ANN. § 66–11–102(c), the statute which creates the lien in favor of architects, specifically provides that such liens are subordinate to any mortgage unless the architectural lien claimant gives written notice to the mortgage holder prior to recordation of the mortgage. First Tennessee states that it is undisputed that CainRash did not give written notice to First Tennessee of its lien claim prior to the recording of First Tennessee's mortgage on March 23, 2000. Thus, according to First Tennessee, under the plain language of TENN. CODE ANN. § 66–11–102(c), CainRash's lien is inferior to First Tennessee's mortgage.

In response to the motion to dismiss, CainRash does not deny that it did not provide First Tennessee prior notice of its lien. Instead, CainRash asserts that First Tennessee has misconstrued TENN. CODE ANN. § 66–11–102(c). According to CainRash, § 66–11–102(c) does not provide that unnoticed architectural liens are inferior to all mortgages, only mortgages of record when the architectural lien attached. Because First Tennessee's mortgage was not of record when CainRash's lien attached, it is inferior asserts CainRash.

## II.

As recognized by the parties, TENN. CODE ANN. § 66–11–102(c) is the controlling statute. The first paragraph of this statute creates the lien in favor of architects:

> There shall be a lien upon any lot of ground or tract of land upon which a house or structure has been erected, demolished, altered, repaired, or improvements made, by special contract with the owner or the owner's agent, in favor of any person licensed to practice architecture or engineering under title 62, chapter 2, for architectural or engineering services performed on such tract or building. The lien shall secure the agreed contract price thereof or a reasonable price for the services performed by such architect or engineer.

TENN. CODE ANN. § 66–11–102(c)(1). The parties do not dispute that based on the language of this paragraph, CainRash has a lien for the architectural services rendered in connection with Carnegie Hotel.

The second paragraph of § 66–11–102(c) describes the effective date of an architect's lien and its relative priority:

> The lien provided for in subdivision (c)(1) shall relate to and take effect from the time of visible commencement of operations as provided in § 66–11–104. Any such architectural or engineering lien shall be subordinate to the lien of any mortgagee unless the lienor has given written notice of the lienor's lien to such mortgagee prior to the recordation of the mortgage.

Tenn. Code Ann. § 66–11–102(c)(2). Under the first sentence of this provision, an architectural lien takes effect or attaches upon "visible commencement of operations," *see* Tenn. Code Ann. § 66–11–104 [2]; which the Tennessee Code defines as "the first actual work of improving upon the land . . . ." *See* Tenn. Code Ann. § 66–11–101(17).[3] CainRash asserts that "visible commencement of operations" took place more than a year before First Tennessee's lien was recorded, a fact which is not disputed by First Tennessee, and, thus, CainRash's lien attached prior to the recordation of First Tennessee's mortgage.

Which lien has priority turns on the proper interpretation of the second sentence in Tenn. Code Ann. § 66–11–102(c)(2), which as quoted above provides: "Any such architectural or engineering lien shall be subordinate to the lien of any mortgagee unless the lienor has given written notice of the lienor's lien to such mortgagee prior to the recordation of the mortgage." From a reading of § 66–11–102(c)(2) in its entirety, the phrase "any such architectural or engineering lien" refers to the lien created under subdivision (c)(1), and therefore would include Cain-Rash's architectural lien. And, the phrase "the lien of any mortgagee" would appear to include the deed of trust held by First Tennessee since the word "any" is used. Substituting the names of the parties in this case for the generic terms in the second sentence of § 66–11–102(c)(2) pro-

duces the statement: "CainRash's lien shall be subordinate to the lien of First Tennessee unless CainRash has given written notice of its lien to First Tennessee prior to the recordation of First Tennessee's mortgage." Thus, as First Tennessee argues, a straight-forward reading of the statute indicates that CainRash's lien is inferior to First Tennessee's mortgage because CainRash did not give written notice of its lien to First Tennessee before First Tennessee recorded its mortgage.

Contrary to this interpretation, Cain-Rash argues that the phrase "the lien of any mortgagee" must be construed to refer only to recorded mortgages in place when the architectural lien attaches. CainRash bases this contention on the statute's use of the present tense "any such lien . . . shall *be* subordinate." CainRash argues that "had the [Tennessee] legislature intended for the architect's lien to be subordinate to mortgages that were recorded after visible commencement of operations, it would have said 'any such lien shall *become* subordinate.'" CainRash also maintains that "[i]t would be impossible for an architect to give notice of its lien to a mortgagee who wasn't a mortgagee when the architect agreed to perform architectural services" because it "is almost always the case" that the architect is employed before financing is obtained. In light of these circumstances, an architect would always have an inferior lien if the

---

**2.** Tenn. Code Ann. § 66–11–104, entitled "Time of attachment of lien," provides in part that:

> (a) Such lien shall relate to and take effect from the time of the visible commencement of operations, excluding however, demolition, surveying, excavating, clearing, filling or grading, placement of sewer or drainage lines or other underground utility lines or work preparatory therefor, erection of temporary security fencing and the delivery of materials therefor.

**3.** Tenn. Code Ann § 66–11–101(17) states as follows:

> "Visible commencement of operations" means the first actual work of improving upon the land or the first delivery to the site of the improvement of materials which remain thereon until actually incorporated in the improvement, of such manifest and substantial character as to notify interested persons that an improvement is being made or is about to be made on the land.

interpretation of First Tennessee were adopted, a result that the state legislature could not have intended asserts CainRash.

Lastly, CainRash argues that its interpretation is supported by § 66–11–102(c)'s legislative history which indicates that the statute would give "architects and engineers the same right as materialmen in regard to a lien on a project." H.R. 1435, 92d Gen. Assem., 2d Reg. Legis. Sess. (Tenn.1982) (transcript of March 17, 1982 floor statement by Rep. McKinney). As noted by CainRash, a mechanic or materialman who supplies labor or material under contract with the owner has a lien which relates to and takes effect from the time of the visible commencement of operations. *See* Tenn. Code Ann. §§ 66–11–102 and 66–11–104. Because under Tennessee law a mechanic's or a materialman's lien has priority over a subsequently recorded mortgage, a architectural lien should also contends CainRash.

### III.

▮ Unfortunately, no reported decision, either in the state or federal courts, has addressed the proper construction of Tenn. Code Ann. § 66–11–102(c). Even so, the Tennessee Supreme Court has often expressed general rules of statutory construction. As stated recently by that court:

The cardinal rule of statutory construction is to follow the plain meaning of the statute where the language is clear and unambiguous on its face. "Legislative intent or purpose is to be ascertained primarily from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language."

*Jackson v. General Motors Corp.*, 60 S.W.3d 800, 804 (Tenn.2001) (quoting *Hamblen County Educ. Ass'n v. Hamblen*

*County Bd. of Educ.*, 892 S.W.2d 428, 431 (Tenn.App.1994)).

▮ In this same vein, the Tennessee Supreme Court has observed that

In construing legislative enactments, the principal goals are to ascertain the legislative intent and give it effect without unduly restricting or expanding its coverage beyond its limited scope. [Citation omitted.] That intent is primarily discerned from the language of the enactment. [Citation omitted.] "Courts are restricted to the natural and ordinary meaning of the language used by the legislature in the statute, unless an ambiguity requires resort elsewhere to ascertain legislative intent." [Citation omitted.] Where different meanings are possible from the language, an ambiguity exists.

*Halbert v. Shelby County Election Comm'n*, 31 S.W.3d 246, 248 (Tenn.2000).

Applying these principles to Tenn. Code Ann. § 66–11–102(c)(2), this court agrees with First Tennessee that the statute is clear and unambiguous on its face. Accordingly, its plain meaning, that an unnoticed architectural lien is inferior to *any* mortgage, must be followed. To limit the "any mortgage" language to "any mortgage in place at the time the architectural lien attaches," as CainRash urges, would "unduly restrict" the statute in contravention of the intent of the legislature as expressed by its chosen verbiage. CainRash's argument that the Tennessee legislature would have used "become," the future tense of "to be," if the statute had been designed to apply to subsequent mortgages is not necessarily accurate. The use of the words "shall be" in conjunction with the use of "any mortgagee" could just as logically reflect the desire that the architect's lien be subordinate to any mortgage regardless of those presently in existence or those which may arise in the

future. Furthermore, one of the meanings of "be" is "to make, cause to become," *see* AMERICAN HERITAGE DICTIONARY 159 (3d ed.1992); and the word "shall" when placed before a verb such as "be" not only indicates an imperative, but also "something that will take place or exist in the future." *Id.* at 1656. If the word "become" had been actually utilized by the legislature, the statute would be unclear because the word suggests a future condition which must occur before subordination takes place.

CainRash's argument that First Tennessee's interpretation would result in the architect's lien always being inferior due to the typical timing of architectural agreements in relation to construction financing arrangements is without merit as the facts of the instant case illustrate. CainRash's contract was entered into and visible commencement of operations occurred more than a year before First Tennessee's mortgage was recorded. Thus, CainRash had over a year in which it could have given notice so that it would have priority over any subsequent mortgagees such as First Tennessee. The assertion that it could not give notice since it would not know the identity of the mortgagee until it records its deed of trust is simply ludicrous because CainRash could have filed a notice of lien with the county register's office which would have constituted notice to the entire world of CainRash's prior lien. *See* TENN. CODE ANN. § 66–26–102 ("All of such instruments so registered shall be notice to all the world . . . .").

■ Similarly, CainRash's argument that First Tennessee's proffered construction is contrary to TENN. CODE ANN. § 66–11–102(c)(2)'s legislative history must be rejected. In this regard, it must first be noted that courts generally only turn to the legislative history of a statute for guidance if the language of the statute is ambiguous and capable of different meanings. "In instances when the language of the statute is clear on its face, we need not reach the question of the legislature's intent in enacting the law . . . ." *ATS Southeast, Inc. v. Carrier Corp.,* 18 S.W.3d 626, 630 (Tenn.2000). Because the Tennessee legislature's intent in enacting TENN. CODE ANN. § 66–11–102(c)(2) is evident from the language utilized, resort to legislative history is unnecessary.

Nonetheless, even if the court were to find § 66–11–102(c)(2) ambiguous, its legislative history does not conclusively support CainRash's proposed construction. Granted, when a Tennessee state representative was introducing the legislation on the House floor in 1982, he did state "this bill . . . gives architects and engineers the same right as materialmen in regard to a lien on a project."[4] H.R. 1435, 92d Gen.

---

4. The following is the full text of Rep. McKinney's statement, as set forth in the transcript prepared by Legislative Research, Inc. and submitted by CainRash:

Mr. Speaker, ladies and gentlemen of the house, what this bill does, it gives architects and engineers the same right as materialmen in regard to a lien on a project. The Senate amended which would not apply to one and two family unit residences, and also that they would have no right of lien until after the actual construction had started. So, which would put in front of any mortgage, and would, behind any mortgage

that might be on the property. So pending any questions, I move the adoption of Senate Bill 1476 on third and final consideration.

CainRash contends that not only does the first sentence of this statement support its argument, but also the third sentence where Rep. McKinney states "[s]o which would put in front of any mortgage, and would, behind any mortgage that might be on the property."

On the other hand, the transcript submitted by First Tennessee is slightly different. It deletes the word "so" at the beginning of the third sentence, combines the second and third

Assem., 2d Reg. Legis. Sess. (Tenn.1982) (transcript of March 17, 1982 floor statement by Rep. McKinney). On the other hand, a statement made on the Senate floor indicates that the specific language in paragraph (2) of § 66–11–102(c) was an amendment to the proposed Senate bill creating architect and engineer liens. In introducing this amendment, Sen. Henry explained that "what it does is provide protection in the lending process so that you can get a clear title under the normal manner without worrying about whether there's a lien on there you can't find." S. 1476, 92d Gen. Assem., 2d Reg. Leg. Sess. (Tenn.1982) (transcript of February 25, 1982 floor statement by Sen. Henry). First Tennessee's interpretation of Tenn. Code Ann. § 66–11–102(c)(2) is the only one that provides protection to lenders from secret liens by subordinating these liens to any mortgage unless notice is given. In contrast, CainRash's construction leaves lenders vulnerable to any undisclosed architectural or engineering lien.

The statement by the House member that the statute will give architects and engineers the same lien rights as materialmen must be disregarded to the extent that it is contrary to the plain language of the statute. *D. Canale & Co. v. Celauro,* 765 S.W.2d 736, 738 (Tenn.1989) ("Where there is no ambiguity in the language of an act, comments of legislators, or even sponsors of the legislation, before its passage are not effective to change the clear meaning of the language of the act."); *BellSouth Telecommunications, Inc. v. Greer,* 972 S.W.2d 663 (Tenn.App.1997) ("[W]hen a statute's text and legislative history disagree, the text controls."). Furthermore, contrary to the House member's assertion, while the enactment of Tenn. Code Ann. § 66–11–102(c) did give architects and engineers liens *similar* to that held by materialmen, the lien rights are not *identical* at least with respect to the relative priority over mortgages. This distinction in treatment is attributable to the specific addition of paragraph (2) to Tenn. Code Ann. § 66–11–102(c), which as previously noted was not included in the original draft of the bill.

An examination of the lien statutory scheme as a whole evidences that paragraph (2) was specifically designed to render architectural and engineering liens inferior to *any* mortgage not just mortgages in existence at the time the lien attached as CainRash contends. Subsection (a) of Tenn. Code Ann. § 66–11–102 establishes the lien on behalf of mechanics and materialmen and subsection (b) grants a similar lien for land surveyors. Both of these provisions where already in effect when subsection (c) on behalf of architects and engineers was added in 1982. Also already in effect in 1982 was Tenn. Code Ann. § 66–11–108 [5] which provides a proce-

---

sentences into one, and puts pauses between a couple of phrases, as if to indicate a misstatement and immediate correction. According to First Tennessee's transcript, the clause at the end of the second sentence reads "which would put them in front of any mortgage that would—behind any mortgage—that might be on the property." Because, as set forth in the text of this memorandum, the court does not find the legislative history to be determinative of the issue before it, it unnecessary to ascertain which transcription is the correct one.

**5.** Tenn. Code Ann. § 66–11–108, entitled "Priority over mortgage," states that:

If the contract is made with the mortgagor, and the mortgagee has written notice of the same by certified or registered mail before the work is begun or materials furnished, and the mortgagee gives written consent thereto, the lien shall have priority over the mortgage; and if the mortgagee fails to object, in writing, within ten (10) days after receipt of the notice, the mortgagee's consent shall be implied; provided, that the person giving notice shall include a name

dure for liens granted under Tenn. Code Ann. § 66–11–102 to have priority over existing mortgages. Under § 66–11–108, a lien created under § 66–11–102 will be superior to a recorded mortgage in existence at the time the lien attaches if the prospective lienholder gives written notice to the mortgagee before the work is begun or materials furnished and the mortgagee fails to object within ten days after receipt of notice. Unless this procedure is followed, the § 66–11–102 lien is subordinate to that of the mortgagee.

Thus, prior to the enactment of Tenn. Code Ann. § 66–11–102(c), the Tennessee lien statutory scheme already contained a mechanism for liens created under Tenn. Code Ann. § 66–11–102 to have priority over existing mortgages. It is simply not logical that the Tennessee legislature would create a special provision advising architects and engineers how they may obtain priority over existing mortgages when an almost identical provision which applied to all lienholders under § 66–11–102(c) was already on the books, so to speak. Because CainRash's interpretation of paragraph (2) of Tenn. Code Ann. § 66–11–102(c) would render it superfluous in light of Tenn. Code Ann. § 66–11–108, that interpretation must be rejected. *See State v. Peele,* 58 S.W.3d 701, 704 (Tenn.2001) ("[S]tatutes should be construed so that no part will be inoperative, superfluous, void, or insignificant ...."); *State v. Turner,* 913 S.W.2d 158, 160 (Tenn.1995) ("In interpreting statutes, we are required to construe them as a whole, read them in conjunction with their surrounding parts, and view them consistently with the legislative purpose.").

■ Finally, the court must note that even if the House member making the statement about materialmen's liens had

intended architects to have exactly the same rights as mechanics and materialmen, this intention is not controlling. As observed on one occasion by the Tennessee Court of Appeals:

> The subjective beliefs of legislators can never substitute for what was, in fact, enacted. There is a distinction between what the legislature intended to say in the law and what various legislators, as individuals, expected or hoped the consequences of the law would be. The answer to the former question is what courts pursue when they consult legislative history; the latter question is not within the courts' domain.

*Greer,* 972 S.W.2d at 673.

■ "When the language contained within the four corners of a statute is plain, clear, and unambiguous, the duty of the courts is simple and obvious, 'to say *sic lex scripta,* and obey it.'" *Hawks v. City of Westmoreland,* 960 S.W.2d 10, 16 (Tenn. 1997). Tenn. Code Ann. § 66–11–102(c)(2) plainly and unambiguously provides that architectural liens shall be subordinate to the lien of any mortgagee unless the lienor gives prior notice to the mortgagee. Because such notice was not given, CainRash's lien is inferior to that of First Tennessee's mortgage. Therefore, First Tennessee's motion to dismiss must be granted.

## IV.

In accordance with the foregoing, an order will be entered contemporaneously with the filing of this memorandum opinion.

---

and return address to which the written objection shall be mailed by certified or

registered mail. Otherwise, the lien shall have no priority over the mortgage.